J-A20005-22

2022 PA Super 175

| | | |
|---|---|---|
| NICOLE EVA GROSS | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JARED ZALMAN MINTZ | : | No. 959 EDA 2022 |

Appeal from the Order Entered March 1, 2022
In the Court of Common Pleas of Montgomery County Civil Division at
No(s): 2017-28078

BEFORE: STABILE, J., McCAFFERY, J., and PELLEGRINI, J.[*]

OPINION BY McCAFFERY, J.: **FILED OCTOBER 13, 2022**

Nicole Eva Gross (Appellant) appeals from the March 1, 2022, order holding her in contempt (Contempt Order) for violating prior custody orders, awarding $20,000 in attorney's fees to Jared Zalman Mintz (Appellee), and prohibiting her from utilizing legal proceedings stemming from an incident in New York without prior approval by the trial court (Gag Order Provision). After careful review, we affirm.

The trial court explained the lengthy factual and procedural history of this case, leading up to the Contempt Order, as follows:

> This case has involved a long and complicated series of child custody disputes between [Appellant] . . . and [Appellee]. . . . The parties have three children — twin girls now 14 years old and a son now 10 years old. The proceedings conducted before the

---

[*] Retired Senior Judge assigned to the Superior Court.

undersigned arose from a number of contempt petitions filed by each party against the other. Trial on the petitions was held on December 8, 2021, January 20, 2022, and February 8, 2022. On March 1, 2022, the [c]ourt issued a Memorandum and Order [(the Contempt Order)] which, *inter alia*, held [Appellant] in contempt in two respects, awarded certain relief for such contempt, and directed the appointment of a Parenting Coordinator.

\* \* \*

The docket reflects a nearly continual history of disputes since the initial filing of a Complaint in Divorce in December of 2017. The facts set forth in this [o]pinion are limited to those relevant to the present appeal.

The central incident occurred while the family was staying at the TWA Hotel at the JFK Airport in New York on the evening of June 30 and the morning of July 1, 2021, so that the two daughters could take a flight to a "teen tour" in California departing that morning. At that point in time, the parties had shared legal and physical custody of the children, pursuant to a Custody Order dated May 17, 2019.[1] The arrangements for the overnight stay in New York were reached with the participation of a Parenting Coordinator that had been assisting the parties since early 2021. The plan was that [Appellant] and the daughters would stay in one hotel room and [Appellee] and the son in a separate room; the two rooms were close by on the same hallway.

[1] Certain modifications to the custody schedule were made by an Agreed Custody Order dated March 25, 2021. Those modifications are not relevant to any issue raised on this appeal.

During the evening of June 30, 2021, there was an encounter between the parents at the hotel, the nature of which was sharply disputed. [Appellant] assert[ed] that [Appellee] assaulted her and threatened one or more of the children. She also allege[d] that [Appellee] assaulted their son the next morning. [Appellee] denie[d] any such conduct. On the morning of July 1, as a result of a report made by [Appellant] to hotel security, [Appellee] was arrested by law enforcement and charged with violations of New York criminal law.

An arraignment was held in the Criminal Court of the City of New York, County of Queens ("the New York Court"), on the evening of July 1, 202[1]. [Appellee] was represented by an

attorney from the Queens Defenders. No testimony was presented, but the judge heard argument from both the Assistant District Attorney and [Appellee]'s counsel on the scope of orders for protection from abuse to be issued. (Ex. D-22.) The New York Court entered Temporary Orders of Protection against [Appellee] — an Order of full protection for [Appellant] and Orders of limited protection for the children [(the "New York Orders")].[2]. . .

> [2] The Order for full protection of [Appellant] was admitted at trial as Exhibit P-5(A) (erroneously cited in the [c]ourt's Memorandum of March 1, 2022, as Exhibit P-5(B)). The record does not appear to have legible copies of the Orders for limited protection of the children.

On Friday, July 9, 2021, [Appellee] filed in the present action [an] Emergency Petition for Contempt and Enforcement of Custody Order. . . . The Emergency Petition recited the [New York Orders]. It further averred that [Appellant], improperly relying on the "limited" Orders for the children, was using self-help by depriving [Appellee] of access to the children, in violation of the Custody Order in effect. Later that day, this [c]ourt, by the Honorable Kelly C. Wall, issued an Order that she would hold a telephone conference on the Emergency Petition during the week of July 12, 2021.

On the morning of the next business day, Monday, July 12, 2021, [Appellant] initiated a protection from abuse (PFA) proceeding against [Appellee] on behalf of herself and the three children, docketed at No. 2021-15058.[3] [Appellant]'s [PFA p]etition . . . was based largely on the incident in New York and the [New York Orders]. After an *ex parte* hearing the same day, this [c]ourt, by the Honorable Daniel J. Clifford, granted a [t]emporary [PFA] [o]rder. The [t]emporary [o]rder provided, with respect to child custody, as follows: "Custody matter pending. Both parties represented by counsel. MCAP [child advocate] counsel can facilitate appropriate contact pending hearing.". . . The Temporary Order was docketed at 2:11 p.m.

> [3] [Appellant]'s counsel stated that he had no objection to the [c]ourt's taking judicial notice of the record of the three PFA proceedings brought by [Appellant] in July, September, and October of 2021. [N.T.,] 12/8/21, at 144; [N.T.], 2/8/22, at 23-24.[]

Also on July 12, 2021, Judge Wall held the telephone conference on [Appellee]'s Emergency Petition in the present

case. Following the conference, Judge Wall issued an [o]rder dated July 12, 2021 [("July 12th Order")], docketed on Tuesday, July 13, 2021. Paragraph 1 of the [July 12th Order] provided: "[Appellee] shall resume his custody schedule on Wednesday with all three children pursuant to the custody order dated May 17, 2019." [Order, 7/12/21, at ¶ 1.] The [July 12th Order] also included the following prohibition: "[Appellant] shall not interfere, restrict[,] or seek to engage in self-help that would vary or restrict physical custody per the May 17, 2019 order." [*Id.* at ¶ 5 (emphasis omitted)].

On July 14 and 15, 2021, despite Judge Wall's [July 12th] Order, [Appellant] withheld the parties' son from [Appellee], even though he was scheduled for custody on those days. [N.T.,] 12/8/21, at 145-49; Ex. P-17, P-18.[] Following an additional telephone conference on the Emergency Petition on July 16, 2021, Judge Wall entered a separate [o]rder of that date [("July 16th Order")], providing in part: "[Appellant] shall not utilize the New York Orders and/or provide them to third parties in an attempt to prevent [Appellee] from exercising his custody." [Order, 7/16/21, at ¶ 3]. There is no question that [Appellant] was aware of [the July 16th] Order: she signed and filed a *pro se* Notice of Appeal from the [July 16th] Order to the Superior Court on August 16, 2021.[4]

[4] The appeal was quashed by the Superior Court. *Gross v. Mintz*, No. 1669 EDA 2021 (Pa. Super. Sept[.] 7, 2021). . . .

At some unspecified point in July, [Appellant] dismissed the Parenting Coordinator that had been assisting the parties. [N.T.,] 12/8/21, at 109-10, 201.[]

On July 31, 2021, the New York State Office of Children and Family Services [("NYOCFS")] issued a letter reporting on the results of its investigation into the report of suspected child abuse or maltreatment arising from the hotel incident. The agency found that the report was "unfounded" — *i.e.*, that there was no "believable proof (credible evidence) that a child was abused or maltreated."

On August 5, 2021, [Appellant], represented by counsel, filed a Praecipe to withdraw without prejudice the PFA Petition that she had filed on July 12, 2021. By Order dated August 6, 2021, the [c]ourt approved the withdrawal and vacated the Temporary Order against Father.

- 4 -

On August 9, 2021, the Pennsylvania Department of Human Services issued a letter reporting on its own investigation of suspected child abuse of the parties' son and determined that it was "[u]nfounded."

On September 11, 2021, [Appellant] submitted a report to the New York Police Department, complaining that [Appellee] was in contempt of the New York Orders. Insofar as the police report indicates, the conduct alleged against [Appellee] was that he had contacted [Appellant] to ask when he could "get my kids." [N.T.,] 12/8/21, at 102-03.[] Upon review of the transcript of the arraignment, the police dismissed the complaint. [*Id.*] at 104-05. . . .

On September 29, 2021, [Appellant] initiated another PFA proceeding against [Appellee] in this [c]ourt by filing a [PFA] Petition . . . on behalf of the children, docketed at No. 2021-19601. Paragraph 17 of the [PFA] Petition contained the following requests in boldface and all capital letters:[5]

[Appellant] is pleading for sole physical and legal custody of 3 minor children no contact between [Appellee] and children during interval while criminal matters proceed in New York and pending results of final disposition in criminal matters.

\* \* \*

[Appellant] wishes to have a Judge[']s order to the Prothonotary to register the NY Order in PA[.]

[Appellant] wishes for Judge to Notice [*sic*] that this PFA supersedes all custody orders[.]

[Appellant] requests no MCAP granted in order to preserve children as victim[']s witness for NY criminal case[.]

[PFA Petition, 9/29/21, at 3 (boldface and capitalization omitted).]

[5] Although the [PFA] Petition is on a standard computer-generated form, the use of boldface and all capital letters indicates an insertion specifically requested by the petitioner.

[Appellant]'s handwritten statement within the [PFA] Petition made repeated reference to the New York proceedings, including the criminal charges. The statement asserted: "[Appellee] arrested 7/1/2021 — protection orders (criminal NY

state) . . ." and further asserted: "NY CPS confirmed 7/9/2021: 'confirmed its a full stayaway order of protection for you and the children against [Appellee] that is enforceable across the country.'"[6] At an *ex parte* hearing held the same day before the Honorable Rhonda Lee Daniele, [Appellant] again made extensive reference to the New York Orders. . . . As a result of the Petition and *ex parte* hearing, Judge Daniele entered a Temporary [PFA] Order on September 29, 2021, ordering [Appellee] to have no contact with the children and superseding all prior custody orders.

> [6] This "confirmation" was apparently based on a text message to [Appellant] from an official in New York, stating, apparently incorrectly, that the Order of Protection for the children was a "full stayaway order." The message was not offered in evidence at the trial of the present case but was attached to [Appellant]'s PFA Petition.

At trial in the present case, when [Appellant] was confronted with a copy of her September 29 Petition that appeared to "utilize the New York Orders and/or provide them to third parties in an attempt to prevent [Appellee] from exercising his custody," as prohibited by Judge Wall's Order of July 16, 2021, [Appellant]'s testimony was evasive and disingenuous:

Q. [By Appellee's counsel:] . . . How many petitions from abuse did you file after that based on the New York order?

A. Zero. . . .

Q. Let me rephrase it. Did you file any abuse petitions in this courthouse after Judge Wall's order where you used the New York protection?

A. No.

Q. No? Are you sure about that?

A. Maybe you don't understand my answer. Can I elaborate, Judge, Your Honor?

Q. Did you file —

THE COURT: Why don't you elaborate. Go ahead.

THE WITNESS: I filed a petition on behalf of the children in September because I had multiple, multiple interactions with the DA prosecutor, including the Second Chief Deputy

Neiberg, the entire Queens DA[,] who called me multiple times to say she was highly concerned about my case. There was an outstanding warrant for [Appellee]'s arrest in New York, and he was refusing to turn himself in.

THE COURT: Did that petition for a PFA that you filed refer to the New York order?

THE WITNESS: It referred to it in part. And, in addition, I also that same week had received a phone call from Children and Youth that there were multiple phone calls —

THE COURT: Okay. The answer is that that petition did refer to the New York order?

THE WITNESS: No, not the New York order, the New York assault. The New York order was my PFA.

[Appellee's counsel]: Wait a minute.

THE WITNESS: I don't understand the question.

[N.T., 1/20/22, at 94-96].

Later in cross-examination, [Appellant] acknowledged that in petitioning for a PFA order, she understood that the requested relief would deprive Father of his custody time:

Q. [Appellant], did you understand that every time you went to a court to get a temporary *ex parte* order that during the course of that order, [Appellee] wasn't going to be seeing his children? Didn't you understand that that was going to affect custody? Weren't you requesting in each of your petitions that the children not have access to their father?

A. Yes.

Q. Okay.

A. I was requesting protection from abuse.

[***Id.*** at 104-05].

Nevertheless, [Appellant] denied that her September 29[th PFA] Petition was in violation of Judge Wall's Order of July 16, 2021, because actual copies of the New York Orders were not *attached* to the Petition. This argument was pressed by

- 7 -

[Appellant]'s counsel, and [Appellant] herself joined in from the witness stand:

> [Appellant's counsel]: [Appellee's] cross-examination involves [Appellant]'s use of the New York protection order or including it in a filing — in a PFA filing. And what's attached here [in the September 29 Petition] is not a protection order in New York; it's a list of charges that are outstanding or were filed — I'm not saying they're outstanding -- were filed against [Appellee]. . . .
>
> THE COURT: All right.
>
> THE WITNESS [Appellant]: I did not attach —
>
> THE COURT: The next to last page [of the Petition] does say . . . under Item 7: [NYOCFS] confirmed 7/9/2021, quote, confirmed it's a full stay-away order of protection for you and the children against dad that is enforceable across the country, close quote. That sounds to me like a use of an order or an alleged order from New York. Am I missing something?
>
> THE WITNESS: It says prior acts —
>
> THE COURT: Excuse me.
>
> [Appellant's counsel]: It's a reference — it is a reference to an order, but I don't think that she was precluded from introducing what happened in New York. She is not relying on it —
>
> THE COURT: I understand that position. But it looks to me like this document does more than simply refer to the incident. It refers to alleged order or orders issued by New York State. Doesn't it?
>
> [Appellant's counsel]: It makes reference to it, yes.
>
> THE COURT: All right.
>
> [Appellant's counsel]: I can't argue that it doesn't.
>
> THE COURT: So I don't follow your objection, then.
>
> [Appellant's counsel]: My objection was that the order wasn't attached. She didn't have the order in her hands.

THE WITNESS: So, yeah. I mean, I didn't attach any orders to my filing.

[*Id.* at 98-100.]

On October 7, 2021, all proceedings against [Appellee] in the New York Court were dismissed. On the next day, October 8, 2021, [Appellant] filed in this [c]ourt yet another PFA Petition against [Appellee], this time solely on her own behalf, docketed at No. 2021-20162. It is not clear whether [Appellant] was at this time aware of the dismissal of the New York proceedings against [Appellee]. In any event, the Petition again made extensive reference to the incident at the New York airport hotel and included a copy of the Order of Protection for [Appellant] entered by the New York Court. At an *ex parte* hearing on October 8, 2021, a Temporary PFA Order was issued by the Honorable Todd D. Eisenberg on behalf of [Appellant].

On October 12, 2021, in the prior PFA matter brought on behalf of the children, Judge Eisenberg issued an Amended Order, docketed October 14, 2021, denying a final PFA order on [Appellant]'s Petition on behalf of the children (*i.e.*, the Petition filed September 29, 2021). Nevertheless, during the period from September 29, 2021[] until October 12, 2021, [Appellee] could have no contact with the children.

On November 9, 2021, a final hearing was held before Judge Daniele on this latest PFA Petition. The hearing included testimony by both [Appellant] and [Appellee], photographs presented by [Appellant] to show her alleged injuries from the New York incident, and two videos, from two different perspectives, taken in the hotel hallway by hotel security cameras — one on the evening of June 30, 2021, and the other the next morning. On the basis of all the evidence, Judge Daniele denied a final PFA order. In doing so, she issued from the Bench extensive findings, including the following:

Let me also comment that clearly the eight seconds or so that [Appellee] appeared [on the videos] to have been within the door frame of her room, although I heard some aggression in the way he knocked on the door, I didn't hear any aggression once he had gained access to the room, and the only thing I heard was [Appellant's] screaming.

Could she have been setting him up? I guess it's possible, I don't know. Quite frankly, I think one — that's one

explanation that could be possible. I think she has tried to exaggerate her testimony in such a way that it certainly causes me to pause with respect to believing her testimony.

She exaggerated her injuries that were . . . a direct result of this particular incident. Some of these injuries she has since acknowledged that they occurred at an earlier point in time, and I think her attempt to exaggerate them in today's hearing, cause[s] me to be not sure of whether she's telling the truth or not.

I'm on the fence, haven't been pushed off the fence, therefore the burden of proof is not sustained, the petition is denied.

[N.T., 11/9/21, at 154-55.]

On November 24, 2021, [Appellant] took the son out of school early, before [Appellee] could pick up the son at the scheduled time to begin his custody period.

As noted above, trial on various petitions by both parties was held over three days between December 2021 and February 2022. In addition to his own testimony denying any assault or abuse at the New York hotel, [Appellee] presented the testimony of two child advocates who had served as counsel for the parties' children, both of whom testified that they found no evidence of abuse of the children. [N.T.,] 12/8/21, at 42-91.[] [Appellant] testified to [an] assault and threats by [Appellee] at the hotel. [Appellant] also called her own mother (the children's maternal grandmother), who testified that the parties' daughters had a good relationship with [Appellant] and thrived under her care and that they preferred staying with [Appellant]. The [c]ourt also viewed the two videos taken in the hotel hallway — the same videos that had been viewed by Judge Daniele in the prior PFA hearing. [*Id.*] at 161-62; [N.T.,] 1/20/22, at 154-57.[][7] Despite [Appellant]'s repeated assertions that the videos were proof of [Appellee]'s abusive behavior,[8] the [c]ourt saw no assault or abuse in the videos.

[7] The first video was marked as Exhibit P-27. The second video was not marked or offered in evidence.

[8] "He ran through me, assaulted me, and went after our daughter. . . . It's on the video." [N.T.,] 1/20/22, at 109.[] "Q. There's nothing in this [police report] that says that he

charged at either of your girls. A. But the video speaks for itself." [*Id.*] at 112. "Q. Are you saying that on the video he grabbed your arm outside the room? A. Absolutely." [*Id.*] at 153. [Appellant]'s counsel made the same assertion: "I'm going to be showing video to show exactly what occurred in that New York hotel room." [*Id.*] at 31.[]

In a Memorandum and Order dated March 1, 2022, the [c]ourt found [Appellant] in contempt in two respects. First, [Appellant]'s filing of the Petition for [PFA] on September 29, 2021, making repeated references to the protection orders entered in the New York Court, constituted a contempt of paragraph 3 of Judge Wall's Order of July 16, 2022. Second, [Appellant]'s withholding of the son from [Appellee] on July 14 and 15, 2021, and her early pickup of the son from school on November 24, 2021, constituted contempt of the Custody Order of May 17, 2019, as reconfirmed in Judge Wall's Order of July 12, 2021.

The [c]ourt ordered various remedies for these acts of contempt. On the violation of Judge Wall's Order of July 16, 2021, since [Appellant] persisted in unreasonably construing what constituted "utiliz[ation of] the New York Orders" and what constituted "an attempt to prevent [Appellee] from exercising his custody," the [c]ourt broadened the scope of Judge Wall's restriction. It prohibited [Appellant] from[,]

> making any use of the legal proceedings in the State of New York arising out of or relating to incidents at the TWA Hotel on June 30 and/or July 1, 2021, including the arrest of [Appellee], the charges brought against him, and any and all orders of protection issued by the courts of New York, unless [Appellant] has obtained prior approval by this [c]ourt for such use upon a showing of good cause. As used herein, the term "any use" includes, but is not limited to, referring to such proceedings and/or providing copies of documents issued in the course of such proceedings to any court, government office, or child welfare agency.

[Order, 3/1/22, ¶ 2.][9][, 1]

_____

[1] This is the Gag Order Provision that is the subject of Appellant's third claim, discussed *infra*.

⁹ The [Contempt] Order made an exception permitting [Appellant] to use the New York proceedings "by way of defense to any claim brought against her by [Appellee] arising out of such proceedings."

On the violation of the custody schedule, the [c]ourt awarded [Appellee] two consecutive makeup days with the parties' son and set forth a process to determine how those makeup days would be scheduled. On [Appellee]'s request for attorney fees in the amount of $63,734.80, the [c]ourt awarded [Appellee] attorney['s] fees in the amount of $20,000. Finally, the [c]ourt ordered the appointment of a new Parenting Coordinator.¹⁰

¹⁰ While it granted this relief, the [c]ourt rejected other claims of contempt asserted by [Appellee]. In particular, the [c]ourt ruled that [Appellant]'s filing of a PFA Petition on July 12, 2021, did not constitute contempt because it predated the entry of the above-referenced Orders by Judge Wall; and that the filing of a PFA Petition on October 8, 2021, did not constitute contempt because it was not filed on behalf of the children and did not, in Judge Wall's words "attempt to prevent [Appellee] from exercising his custody." The [c]ourt ruled that [Appellant]'s conduct in connection with the arrest and criminal charges against [Appellee] in New York, while it may be otherwise actionable, did not constitute contempt of any order of this [c]ourt. Finally, because of the possibility that the deprival of visitations by the 14-year-old daughters may have resulted from their own resistance rather than [Appellant]'s willful refusal, the [c]ourt declined to hold [Appellant] in contempt in this regard. [Appellee] has not cross-appealed from any of these rulings.

Trial Ct. Amended Op., 5/6/22, at 1-13 (some citations to the record omitted).

Appellant filed a timely notice of appeal from the Contempt Order on March 29, 2022, and she filed a Pa.R.A.P. 1925(b) statement on April 7, 2022.²

---

² It does not appear from the record that the trial court ordered Appellant to file a Rule 1925(b) statement.

The trial court issued a Rule 1925(a) opinion on May 5, 2022, and an amended Rule 1925(a) opinion on May 6, 2022.

Appellant presents one general question for our review: "Did the trial court err or abuse its discretion in holding [Appellant] in contempt of court and awarding attorney['s] fees to [Appellee] as a sanction for violating the trial court's prior custody orders?"  Appellant's Brief at 9.  In the argument section of her brief, Appellant asserts three distinct grounds for reversing the Contempt Order in whole or in part.  First, Appellant alleges that the terms of the prior custody orders were unclear and/or ambiguous.  *Id.* at 34-37.  Second, Appellant claims that Appellee failed to sustain his burden to prove that she acted with wrongful intent in violating the terms of the prior custody orders.  *Id.* at 38-42.  Third, Appellant contends that the Gag Order Provision of the Contempt Order violated her First Amendment rights.  *Id.* at 42-43.

Our standard of review concerning a trial court's contempt findings is very narrow:

> This Court's review of a civil contempt order is limited to a determination of whether the trial court abused its discretion.  If a trial court, in reaching its conclusion, overrides or misapplies the law or exercises judgment which is manifestly unreasonable, or reaches a conclusion that is the result of partiality, prejudice, bias or ill will as shown by the evidence of record, then discretion is abused.

*B.A.W. v. T.L.W.*, 230 A.3d 402, 406 (Pa. Super. 2020) (citation omitted).

"To sustain a finding of civil contempt, the complainant must prove certain distinct elements by a preponderance of the evidence: (1) that the contemnor had notice of the specific order or decree which he is alleged to

have disobeyed; (2) that the act constituting the contemnor's violation was volitional; and (3) that the contemnor acted with wrongful intent." ***P.H.D. v. R.R.D.***, 56 A.3d 702, 706 n.7 (Pa. Super. 2012) (citation omitted). Moreover, "[a] court may exercise its civil contempt power to enforce compliance with its orders for the benefit of the party in whose favor the order runs but not to inflict punishment. A party must have violated a court order to be found in civil contempt." ***Garr v. Peters***, 773 A.2d 183, 189 (Pa. Super. 2001) (citation omitted).

## I.

Appellant first claims that the July 16th Order was not sufficiently "clear and unambiguous" as to the prohibited conduct for which she was held in contempt. Appellant's Brief at 34. She contends that the July 16th Order did not explain "what was meant by 'utilize the New York Orders[,]'" nor did "it define who would be considered 'third parties.'" ***Id.*** at 35. Appellant argues that these alleged ambiguities did not give her specific notice that she was "precluded from seeking [PFA] orders" based on the **facts** or **events** of June 30, 2021, that gave rise to the New York Orders. ***Id.*** at 35-36. She maintains that she "construed" the July 16th Order to "mean that she could not present the New York [**O**]**rders** to the police or camp personnel to prevent [Appellee] from exercising his custodial rights" and that she "did not attach the New York [O]rders to her" PFA petition. ***Id.*** at 35 (emphasis in original). Essentially, Appellant admits that her PFA petition referenced the facts and events leading up to the New York Orders, but she nevertheless contends that her

- 14 -

interpretation of July 16th Order—that it only prohibited her from utilizing the actual New York Orders, and not the facts or events that gave rise to them—was reasonable.

Appellant believes that, because her interpretation of the order was ostensibly reasonable, **Sutch v. Roxborough Mem'l Hosp.**, 142 A.3d 38 (Pa. Super. 2016), and **Lachat v. Hincliffe**, 769 A.2d 481 (Pa. Super. 2001), support her claim that the trial court abused its discretion by holding her in contempt. Appellant's Brief at 34-35. In **Sutch**, this Court stated that, "[t]o be punished for contempt, a party must not only have violated a clear order, but that order must have been **definite, clear, and specific** — leaving no doubt or uncertainty in the mind of the contemnor of the prohibited conduct." **Sutch**, 142 A.3d at 67 (emphasis in original), *quoting* **Stahl v. Redcay**, 897 A.2d 478, 489 (Pa. Super. 2006). Similarly, in **Lachat**, this Court stated that "in order to punish a person for contempt, a 'plausible reading'" of the underlying order "is not enough" to sustain a contempt order because all "inferences and ambiguities in the underlying order must be construed in favor of the alleged contemnor." **Lachat**, 769 A.2d at 490.

The trial court rejected Appellant's argument, finding not only that the terms of July 16th Order were sufficiently definite, clear, and specific to afford Appellant notice of the prohibited conduct, **see** Trial Ct. Amended Op. at 14-15, but also that Appellant violated her own interpretation of the July 16th Order by specifically referencing the New York Orders in her PFA petition, **see**

*id.* at 15.  For the following reasons, we ascertain no abuse of discretion by the trial court.

First, we note that Appellant fails to meaningfully develop her argument that the term "third parties," as used in the July 16th Order, is ambiguous. Apart from baldly asserting its ambiguity, Appellant does not subsequently attempt to explain how that term was unclear in the context of this case.  In any event, the at-issue mandate of the July 16th Order used the term "and/or" as a disjunctive phrase, unambiguously indicating that Appellant could violate the Order by either "utiliz[ing] the New York Orders" **or** by "provid[ing] them to third parties," where either action constituted "an attempt to prevent [Appellee] from exercising his custody" of the children.[3]  Order, 7/16/21, at 1 ¶ 3.  As the trial court found Appellant in contempt for utilizing the New York Orders to interfere with Appellee's custody of the children, it is of no moment whether the term "third parties" was ambiguous in the circumstances of this case, as the court did not find Appellant in contempt for providing the New York Orders to a third party.

Second, we agree with trial court that "the meaning of the term 'utilize' is crystal clear.  It is not technical or legalistic.  Rather, it has a common dictionary definition: 'to make use of: turn to practical use or account,' https://merriam-webster.com/dictionary/utilize;  'to  use  something,'

---

[3] The use of the conjunctive "and" was effectively redundant in the order, as a violation of both clauses necessarily implies a violation of at least one of the clauses.

https://macmillandictionary.com/us/dictionary/american/utilize." Trial Ct. Amended Op. at 14.

Third, we also agree with the trial court that Appellant violated the clear, unambiguous mandate of the July 16th Order by utilizing the New York Orders to interfere with Appellee's custody of the children. As the court explains:

> There is no question that [Appellant] "use[d]" or "ma[d]e use of" the New York Orders in her PFA Petition filed on September 29, 2021. That Petition made extensive references to the New York Orders as a basis for entering a PFA in Pennsylvania, and it expressly requested that "[Appellant] wishes to have a Judge[']s order to the Prothonotary to register the NY Order in PA."

Trial Ct. Amended Op. at 15.

Thus, even if we accepted that Appellant's narrow interpretation of the July 16th Order to have only prohibited her from using the New York Orders as opposed to the underlying facts and allegation leading to those orders, she would still not be entitled to relief. The record simply belies her claim that she did not utilize the orders themselves in her PFA petition, since she specifically asked in the petition for enforcement of the New York Orders in Pennsylvania. *See* PFA Petition, 9/29/21, at 3. Given that specific request, it is immaterial that she did not attach the New York Orders to her PFA petition.

Finally, Appellant's reliance on both *Sutch* and *Lachat* is misplaced. In *Sutch*, the trial court precluded the defense "from presenting any evidence, testimony, and/or argument regarding [the d]ecedent's smoking history." *Sutch*, 142 A.3d at 74. However, defense counsel was not ordered to instruct defense witnesses about the precluded evidence, and the trial court

- 17 -

specifically denied the plaintiff's request for "an explicit directive to defense counsel to remind their witnesses immediately before they took the stand. . . ." *Id.* During defense counsel's direct examination of a witness, the witness mentioned that the deceased was a smoker, in response to a question as to whether he had any cardiac risk factors. *Id.* at 47. The trial court ultimately held defense counsel in contempt for the witness's answer. *Id.* at 61-62. This Court found the contempt order at issue in *Sutch* lacked "the requisite foundational order to support" a finding of contempt because there was no "'definite, clear, and specific order[,]'" as the trial court had specifically refused to instruct defense counsel to remind defense witnesses of the evidentiary preclusion. *Id.*

By contrast, in the instant case, Appellant was specifically ordered not to utilize the New York Orders as a means to deprive Appellee of custody, and it was Appellant, not another party or witness, who ultimately violated that order. As discussed above, the July 16th Order was neither unclear nor ambiguous, and Appellant was obviously aware of the order, as she immediately filed a *pro se* appeal from it. Furthermore, Appellant's excuse for having violated the order — that she only referenced the facts underlying the New York incident rather than the New York Orders themselves — was belied by the record, as she specifically sought enforcement of the New York Orders in her PFA petition. Consequently, we conclude that *Sutch* provides no support for Appellant's claim.

Similarly, *Lachat* does not buttress Appellant's argument. In that case, the parties were engaged in a decades-long property dispute over "a thirty-foot wide tract of land subject to a right-of-way" on Hinchcliffe's property. *Lachat*, 769 A.2d at 484. In 1986, the Lachats filed a lawsuit alleging that "Hinchliffe was impeding their own free use of the right-of-way[.]" *Id.* That litigation ended prior to trial when, in 1988, the parties "entered into a stipulation concerning the disputed right-of-way[,]" resulting in an order issued by the trial court stating, in pertinent part: "Work shall be done on the right-of-way in a workmanlike manner and the roadway restored to the same contour which previously existed; said contour shall be maintained hereafter. Neither party hereto or their heirs and assigns shall interfere in any manner with the other's right to the use of said roadway." *Id.* at 485. Soon thereafter, "the Lachats subdivided their property and conveyed a portion to their daughter, Eileen Young, and her husband, Wilbur, by deed executed July 8th of that year. The deed in question granted the Youngs access to the right-of-way[.]" *Id.* In the subsequent 12 years,

> the relationship between Hinchliffe and the Lachats and Youngs was neither friendly nor "neighborly." Disputes occurred over grass mowing, allegedly improper snow handling, and comments attributed to Hinchliffe that he "owned" one side of the right-of-way while the Lachats and Youngs "owned" the other side. In January of 2000, Hinchliffe began parking flat-bed trailers along the stabilized driveway, allegedly for the purpose of preventing the Youngs and Lachats from driving on grassy areas he maintained within the right-of-way. Hinchliffe also sent a hand-printed note complaining about a large pine tree in the roadway, which he wanted to have either cut down or trimmed because it

- 19 -

interfered with his access to the stabilized roadway. In the note, Hinchliffe threatened to block access along the stabilized drive.

*Id.* (footnotes omitted).

In March of 2000, the "Youngs filed a Petition for Contempt to enforce [the] 1988 order[,]" and a contempt hearing was held the following month. *Lachat*, 769 A.2d at 486. The court held Hinchliffe in civil contempt for violating the stipulated, 1988 order concerning the right-of-way. *Id.* Hinchliffe appealed, arguing, *inter alia*, that the trial court had erred in conflating the terms "right-of-way" and "roadway" as used in the 1988 order, and that although volitional, that his conduct could not be deemed a willful violation of the order. *Id.* at 489.

This Court agreed, concluding that the record demonstrated that "although Hinchliffe parked flatbed trailers and dumped snow within the right-of-way, he did not park the trailers on the stabilized roadway in direct violation of the order of May 13, 1988, nor did he place the snow in a manner that prevented the Lachats or the Youngs from using the roadway." *Lachat*, 769 A.2d at 490. Furthermore, this Court found that no "evidence of record [demonstrated] that Hinchliffe willfully placed himself in noncompliance with the explicit terms of the 1988 order at any time" despite his threats to do so. *Id.*

There are no analogous circumstances in the present case. Appellant was ordered not to use the New York Orders to interfere with Appellee's custody of the children. Despite her argument that the July 16th Order was ambiguous as to whether she could use the alleged **facts** underlying the New

York Orders regarding the June 30, 2021, incident, she specifically sought enforcement of the New York Orders in her September 29, 2021, PFA petition, directly violating the express terms of the July 16th Order. There were no ambiguities in the at-issue order here that were comparable to the order discussed in *Lachat*. Moreover, in *Lachat*, Hinchliffe's violation of the order was factually unproven because the other parties were able to use the roadway.

For all the above reasons, we conclude that Appellant's first claim is meritless.

## II.

Next, Appellant asserts that Appellee failed to sustain his burden to prove that she acted with wrongful intent in violating the July 16th Order. Appellant's Brief at 38-42. She argues that the underlying order was entered "without an evidentiary hearing," and "without the court['s] considering the criminal action and protection orders entered in New York." *Id.* at 39-40. She also repeats her assertion that her PFA petition was "not based on the New York Orders but was instead predicated on new facts supporting a claim of child endangerment, child abuse, and medical neglect[,]" and that she "reasonably believed that her filings were not within the scope of the prior orders." *Id.* at 41.

As noted above, a finding of civil contempt requires proof by a preponderance of the evidence that "the contemnor acted with wrongful intent." *P.H.D.*, 56 A.3d at 706 n.7. "[W]hen making a determination

regarding whether a defendant acted with wrongful intent, the court should use common sense and consider context, and wrongful intent can be imputed to a defendant by virtue of the substantial certainty that his actions will violate the court order." ***Commonwealth v. Reese***, 156 A.3d 1250, 1258 (Pa. Super. 2017).

Initially, as to Appellant's first argument, we fail to see how the absence of a hearing prior to the July 16th Order is relevant to whether Appellant acted with wrongful intent in violating that order, and Appellant provides no further argument or citation to relevant authorities in support of this claim. It is clear from the record that Appellant was aware of the order, given that she filed a *pro se* appeal from it, and so we cannot infer that any lack of notice of the order itself contributed to her violating its terms. Thus, her first argument is meritless.

Her second claim, that the court failed to consider the New York Orders and related criminal action against Appellee in crafting the July 16th Order, is nonsensical, and Appellant again fails to develop this line of thought in any meaningful way. Judge Wall undoubtedly "considered" the New York Orders and related actions to some extent, as the July 16th Order directed Appellant to refrain from utilizing the New York Orders to interfere with Appellee's custody rights. Without any further elaboration by Appellant, we conclude that this argument is meritless.

The remainder of Appellant's wrongful-intent claim concerns whether Appellee failed to show that she acted unreasonably in interpreting the July

12th and 16th Orders.  The trial court rejected these arguments, reasoning as follows:

> By their very nature, [Appellant]'s withholding of the parties' son for two days during [Appellee]'s custody time and her references to the New York Orders in her PFA Petition of September 29, 2021, were "volitional."  There is no way to construe her conduct as accidental or unintended.  Further, the [c]ourt was fully satisfied that [Appellant] acted with "wrongful intent."  The withholding of the son occurred in the direct wake of Judge Wall's Order of July 12, 2021, reconfirming the custody order of May 19, 2019.  And her insertion of specific references to the New York Orders in her PFA Petition and in the *ex parte* hearing was clearly made with knowledge that such conduct was contrary to Judge Wall's Order of July 16, 2021, prohibiting use of the New York Orders to prevent [Appellee] from exercising his custody.  Any doubt on the question of [Appellant]'s bad faith was dispelled by her evasive and self-contradictory testimony at trial. . . .[12]
>
> > [12] [Appellant] argued, through her counsel, that she had not violated Judge Wall's Order because that Order was issued in the present custody case but [Appellant]'s filing of a PFA Petition commenced a new, separate case.  [N.T.,] 1/20/22, at 102; [N.T.,] 2/8/22[,] at 132.[]  This argument is without merit.  Nothing in Judge Wall's Order limits its application to filings made in the custody case.

Trial Ct. Amended Op. at 16.

Instantly, Appellant explicitly violated the terms of the July 12th and July 16th Orders by withholding custody of the parties' son and by filing a PFA petition seeking enforcement of the New York Orders, respectively.  This evidence was sufficient to show wrongful intent under the preponderance of the evidence standard, as wrongful intent "can be imputed" where there is "substantial certainty" that conduct "will violate the court order."  ***Reese***, 156 A.3d at 1258.  To the extent that Appellant testified that she, nevertheless,

did not intend to violate those orders, the trial court did not find her testimony to be credible and, as an appellate court, we afford the trial court's credibility determinations great deference. *See Hollock v. Erie Ins. Exch.*, 842 A.2d 409, 414 (Pa. Super. 2004) ("It is not the role of an appellate court to pass on the credibility of witnesses; hence we will not substitute our judgment for that of the factfinder."). Consequently, we ascertain no abuse of discretion in the trial court's finding that Appellant acted with wrongful intent in violating the July 12th and July 16th Orders. Appellant's second issue is meritless.

## III.

Finally, Appellant claims the Gag Order Provision of the Contempt Order constitutes a content-based, prior restraint on her First Amendment rights that is presumptively unconstitutional and subject to strict scrutiny. Appellant asserts that the

> March 1 [G]ag [O]rder[ Provision]'s prior restraint on [Appellant]'s speech in this case is not content-neutral because it relates to the New York PFA and prohibits [Appellant] from "making use of the New York proceedings for any purpose."
>
> The March 1 [G]ag [O]rder [Provision] makes no effort to tie the prior restraint on [Appellant]'s speech to any possibility of harm to the minor children.
>
> * * *
>
> The March 1 [G]ag [O]rder [Provision] is overly broad and unconstitutional as a contempt sanction because it infringes on [Appellant]'s [F]irst [A]mendment right of free speech under the United States Constitution and Section 7 of the Pennsylvania Constitution. The children have already testified to [Appellee]'s violent tendencies and his assault of [Appellant] and will not be harmed by the granting of a PFA. Preventing [Appellant] from taking legal action to protect her children infringes on the rights

- 24 -

of [Appellant] and her children to take action so they can be protected from imminent bodily harm.

Appellant's Brief at 42-43. In support of her argument, Appellant contrasts the facts and circumstances of this case with those addressed by our Supreme Court in *S.B. v. S.S.*, 243 A.3d 90, 106 (Pa. 2020) (upholding a gag order constricting speech about sexual abuse allegations in custody proceedings), *cert. denied*, 142 S.Ct. 313 (Oct. 4, 2021).

A First Amendment challenge to a gag order presents a question of law, "for which our standard of review is *de novo* and our scope of review is plenary." *S.B.*, 243 A.3d at 104. In such cases, "an appellate court has an obligation to make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression." *Id.* (cleaned up). In reviewing First Amendment challenges, we must consider both the nature of the at-issue speech restriction, as well as its scope, as follows:

> It is well-established that content-based restrictions on speech are presumptively unconstitutional and are subject to the strict scrutiny standard, which requires the government to prove that the restrictions are narrowly tailored to serve a compelling state interest. *Reed v. Town of Gilbert*, 576 U.S. 155, 163 . . . (2015). "Government regulation of speech is content based if a law applies to a particular speech because of the topic discussed or the idea or message expressed." *Id.*
>
> Determining whether a particular restriction on speech is content based or content neutral is not always a simple endeavor. A restriction is content based if either the face of the regulation or the purpose of the regulation is based upon the message the speaker is conveying. *Reed*, 576 U.S. at 163-64. . . . *See e.g., Barr*, *supra* (holding that a federal statute permitting only those robocalls that relate to the collection of government debt is clearly

a content-based restriction on speech because the law favors speech made for collecting government debt over political and other speech).

To the contrary, "regulations that are unrelated to the content of speech are subject to an intermediate level of scrutiny because in most cases they pose a less substantial risk of excising certain ideas or viewpoints from the public dialogue." **Turner Broad. Sys.** [**v. F.C.C.**], 512 U.S. [622,] 642 [(1994)] (internal citation omitted). A content-neutral regulation of speech passes constitutional muster if it satisfies the following four-part standard set forth by the High Court in **United States v. O'Brien**, [391 U.S. 367 (1968)]: (1) the regulation was promulgated within the constitutional power of government; (2) the regulation furthers an important or substantial governmental interest; (3) the government interest is unrelated to the suppression of free expression; and (4) the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest. []**O'Brien**, 391 U.S. at 377. . . .

So long as the regulation of speech is not a means, subtle or otherwise, of exercising content preference, it is not presumed invalid. **See Turner Broad. Sys.**, **supra** (deeming the challenged statute content neutral because the face of the statute distinguishes between speakers in the television programming market based only on the manner in which the programmers transmit their messages to viewers, not the content of the messages they carry, and the purpose for which the statute was enacted is also unrelated to content).

Restrictions on the time, place and manner of expression, whether oral, written or symbolized by conduct, are a form of a content-neutral regulation of speech. **Clark v. Community for Creative Non-Violence**, 468 U.S. 288, 293 . . . (1984). These restrictions may make it more difficult for an individual to engage in a desired speech-related activity by targeting, *inter alia*, the means of speech or the method of communication, but they do not target the content of the message ultimately conveyed. Time, place, and manner restrictions are valid, provided that they: (1) are justified without reference to the content of the regulated speech; (2) are narrowly tailored to serve a significant governmental interest unrelated to speech;[12] and (3) leave open ample alternative channels for communication of the information. **Id.**

[12] The United States Supreme Court has clarified that "a regulation of the time, place, or manner of protected speech must be narrowly tailored to serve the government's legitimate, content-neutral interests but that it need not be the least restrictive or least intrusive means of doing so." ***Ward v. Rock Against Racism***, 491 U.S. [781,] 798 . . . [(1989)].

The High Court has explained that "[t]he principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." [***Id.***] at 791 . . . (internal citation omitted). The government's purpose of the speech restriction is the controlling consideration and, if the purpose is unrelated to the expression of content, the restriction is deemed neutral, even though the speech restriction may have an incidental effect on some speakers or messages, but not others. ***Id.***

While the precise text of the two constitutional standards differ (*i.e.*, the ***O'Brien*** standard employed to determine whether a regulation of speech is content neutral and the specific standard applicable to time, place, and manner restrictions on speech), the High Court has clarified that the ***O'Brien*** standard "is little, if any, different from the standard applied to time, place, or manner restrictions." ***Community for Creative Non-Violence***, 468 U.S. at 298. . . .

***S.B.***, 243 A.3d at 104–06.

Thus, under the standards discussed in ***S.B.***, our first inquiry is to determine whether the speech restriction involved here is a content-neutral restriction on the time, place, and manner of speech, or whether the restraint on speech is intended to enforce a disagreement with the content of the restricted speech. Here, the trial court found the Gag Order Provision was necessary because:

[Appellant] repeatedly advanced unreasonably narrow constructions of Judge Wall's Order of July 16, 2021, in an attempt

- 27 -

to justify her utilization of the New York Orders in filing and advancing her PFA Petition of September 29, 2021. Further, the New York Orders were issued against [Appellant] without an opportunity to present evidence, and every subsequent independent investigation and . . . hearing on the allegations that led to the issuance of the New York Orders found the allegations to be unfounded or unproved. In view of [Appellant]'s repeated misuse of the New York Orders and her contrived efforts to narrow the scope of Judge Wall's Order restricting her use of the New York Orders, the [c]ourt prohibited [her] from making any use of the New York Orders without prior judicial authorization.

The [c]ourt plainly had authority to issue such a prohibition. "[A] pattern of groundless and vexatious litigation will justify an order prohibiting further filings without permission of the court." ***Coulter v. Lindsay***, 159 A.3d 947, 956 (Pa. Super. 2017) (quoting ***Chipps v. U.S.D.C. for the M.D. of Pa.***, 882 F.2d 72, 73 (3d Cir. 1989)). Pennsylvania Appellate Courts have issued injunctions against repeated vexatious filings by a litigant. ***See, e.g., Bolick v. Commonwealth***, 69 A.3d 1267, 1269 (Pa. Super. 2013) (issuing injunction where party "has long abused the judicial process with repeated filings that raise issues decided previously"); ***Winpenny v. Winpenny***, 775 A.2d 815, 818 (Pa. Cmwlth. 2001).

The [c]ourt's exercise of this authority was fully supported by the conduct of [Appellant] in her misuse of the New York Orders. She has repeatedly filed PFA Petitions against [Appellee] on the basis of the New York Orders and the underlying incident in New York, knowing that the *ex parte* nature of the [c]ourt's initial consideration of the Petitions would enable her to obtain Temporary PFA Orders without full disclosure of the relevant facts. None of these PFA Petitions have resulted in final orders of protection. She has harassed [Appellee] through her serial PFA filings and her repeated complaints to child welfare agencies, which have been determined to be unfounded. Two judges of this [c]ourt — Judge Daniele and the undersigned — have heard [Appellant]'s testimony about the alleged assault in New York and have viewed the videos that she claimed to corroborate her testimony, and both judges have been unpersuaded. The New York proceedings against [Appellee] have now been dismissed.

Most significantly, [Appellant] was previously subjected, by Judge Wall's Order of July 16, 2021, to a narrower prohibition, restricting her from utilizing the New York Orders in "an attempt

- 28 -

to prevent [Appellee] from exercising his custody." Instead of complying with that restriction, she blatantly violated it in the filing of her PFA Petition on September 29, 2021, and her testimony in the *ex parte* hearing held on that Petition. When called to account at the trial of this matter, she engaged in a frivolously narrow reading of Judge Wall's Order in an attempt to excuse her violation. Where [Appellant] has shown that she cannot be counted upon to abide by a narrow prohibition, a broader restriction is necessary to prevent her from evading it through similar prevarication.

The [c]ourt recognizes that its injunction is not limited to judicial filings but also prohibits [Appellant] from making other use of the New York proceedings, such as referring to them in any submission to a government office or child welfare agency. This expanded scope was necessary in view of [Appellant]'s prior use of the New York proceedings in her complaints to [NYOCFS], which were ultimately determined to be unfounded. Injunctions to prevent frivolous and harassing filings in a court have also been extended in a similar fashion. ***See, e.g., United States v. Kaun***, 827 F.2d 1144 (7th Cir. 1987) (injunction against tax protestor from disseminating false and fraudulent method for avoiding payment of federal taxes).

Trial Ct. Amended Op. at 18-20 (some citations omitted).

The trial court further stated:

Pennsylvania Courts do not appear to have addressed the free speech implications of an injunction against frivolous filings, but federal courts have repeatedly upheld such injunctions, when properly supported, against First Amendment challenges. "Just as false statements are not immunized by the First Amendment right to freedom of speech, baseless litigation is not immunized by the First Amendment right to petition." ***Bill Johnson's Restaurants, Inc. v. NLRB***, 461 U.S. 731, 743 (1983) (citations omitted); ***see, e.g., Riccard v. Prudential Ins. Co.***, 307 F.3d 1277, 1298 (11th Cir. 2002) ("A vexatious litigant does not have a First Amendment right to abuse official processes with baseless filings in order to harass someone to the point of distraction or capitulation."); ***Filipas v. Lemons***, 835 F.2d 1145, 1146 (6th Cir. 1987); []***Kaun***, 827 F.2d [at] 1153-54. . . . No greater protection is provided by Article I, section 7, of the Pennsylvania Constitution, as its free speech provision is generally coextensive

with that of the First Amendment. *See S.B.*[], 243 A.3d at 112-13. . . .

Trial Ct. Amended Op. at 20-21.

Here, the trial court's express purpose for issuing the Gag Order Provision was to prevent continued, vexatious litigation by Appellant that was interfering with Appellee's custody rights. Appellant makes no effort in her argument to address this purpose and, instead, baldly declares that the restriction was not content-neutral, contending that this case is distinguishable from *S.B.* We disagree with Appellant.

In *S.B.*, S.B. and S.S. were also engaged in a protracted custody dispute over their child, F.H.B. *S.B.*, 243 A.3d at 94. S.B. adopted F.H.B. in 2007, and raised the child alone from 2008 until 2012 after his first wife died. *Id.* at 95. He married S.S. in 2012, and S.S. adopted F.H.B. in 2013. *Id.* However, the couple soon separated, and a custody battle began. *Id.* In 2015, S.S. filed a PFA petition against S.B., alleging that S.B. had sexually abused F.H.B. *Id.* After entering a temporary PFA order against S.B., the trial court conducted a 5-day hearing, ultimately concluding that the sexual abuse allegations were not credible. S.S. filed another PFA petition against S.B. in 2016, again alleging sexual abuse of F.H.B., but that PFA petition was also denied. *Id.* After a custody trial was held later that year, S.B. was granted sole legal and physical custody of F.H.B. *Id.*

While S.S.'s appeal from that decision was still pending resolution, S.S.'s attorney "held a press conference on the online video-sharing platform, YouTube, expressing [S.S.]'s fervent disagreement with the trial court's

findings and orders in the custody matter." *Id.* at 96. During the press conference, the attorney "identified [S.S.] by name and … included a link providing access to a reproduction of F.H.B.'s in-court testimony and forensic interview, during which Child sets forth detailed allegations of [S.B.'s] sexual abuse, which the trial court had deemed unfounded." *Id.* Although F.H.B. was not specifically identified by name, the child "obviously could have been identified by virtue of the disclosure of [S.S.]'s identity." *Id.*

S.B. filed a motion for sanctions, which was denied because there were no standing orders preventing the parties from speaking publicly about the custody dispute. However, the trial court issued a gag order, directing S.S. and her attorneys not to "speak publicly or communicate about this case including, but not limited to, print and broadcast media, on-line or web-based communications, or inviting the public to view existing on-line or web-based publications." *Id.* at 97. The gag order also restricted S.S. and her attorneys from directing or encouraging third parties to do the same. *Id.* The gag order permitted S.S. and her attorneys to provide public testimony before state or federal legislatures regarding sexual abuse, so long as S.S., S.B., and F.H.B. were not identified. *Id.* S.S. and her attorney were also instructed to remove all publicly-posted information about the case from YouTube and other internet forums. *Id.* The trial court justified the gag order because "the right of [F.H.B.] to be free from undue scrutiny, ridicule, or scorn, outweighs the rights of [S.S.] and her attorney to engage in thoughtless, toxic, misleading and vengeful discourse about this case." *Id.* at 98 (internal quotation marks

omitted). S.S. appealed, and this Court affirmed. *See S.B. v. S.S.*, 201 A.3d 774 (Pa. Super. 2018).

The Pennsylvania Supreme Court granted allowance of appeal and ultimately upheld the trial court's gag order. In its analysis of S.S.'s free speech claim, the *S.B.* Court first rejected her contention that the gag order constituted "a total ban on all speech relating to the topic of [the] custody proceeding," as that "contention [was] unsupported by the order's plain text and its clearly articulated purpose." *Id.* at 106. To the contrary, "while the gag order precludes [the a]ppellants from speaking publicly about 'this case,' when read in context, the order affords [the a]ppellants ample opportunity to disseminate all of their thoughts into the marketplace of ideas without restriction on the content of their message." *Id.* at 107. The Court further found that:

> The gag order also does not discriminate against speech relating to the trial court's actual entry of the gag order itself or speech criticizing the trial court's judgment in issuing that order. As noted, once [the a]ppellants remove from the public domain the enumerated information found to be harmful to [the child], they are free to criticize the trial court's decision, assuming they do so in a manner that does not disclose [the c]hild's identity. Hence, the gag order places no restraint on [the a]ppellants' message regarding the governmental actions that were taken in connection with [the] custody case.

*Id.* Consequently, the *S.B.* Court held that the gag order was content neutral and, therefore, not subject to strict scrutiny. *Id.* As such, the Court applied "the intermediate standard of constitutional scrutiny set forth in . . . *O'Brien*,

. . . as well as the similar federal precedent applicable to restrictions placed on the time, place, and manner of speech." *Id.*

Analyzing the matter under the four *O'Brien* factors, the *S.B.* Court concluded that the gag order was narrowly tailored to furthering the important government interest of protecting F.H.B. *Id.* at 107-11. Under the first factor, the *S.B.* Court simply noted that there was no dispute that the trial court had the constitutional power to act in the interest of the child in the context of a custody dispute "aside from its effect on free speech rights[.]" *Id.* at 107. Under the second factor, the Court considered "the speech restriction further[ed] an important or substantial governmental interest." *Id.* at 108. The Court held that "a restriction on the manner of parental speech in a custody case furthers an important governmental interest where there is a substantial likelihood that the restrained speech has harmed or will imminently harm the child." *Id.* at 110.

The *S.B.* Court next considered whether the justification for the gag order was related to the content of the restricted speech, concluding that it was not. *Id.* Finally, the Court analyzed whether the speech restriction was narrowly tailored to the government interest at stake, concluding that it was, since the appellants were still permitted to express their opinions in public forums so long as the identity of the child was protected, and because the gag order did not impose any restrictions on the press. *Id.* at 110-11.

Instantly, Appellant first argues, with scant discussion, that the Gag Order Provision is a content-based restriction on her speech. We disagree.

- 33 -

As stated in the trial court's opinion, and as is suggested by the text of the provision itself, Appellant is not restricted from making any reference to the New York Orders and related events in any and all circumstances, nor does the Gag Order Provision restrict her speech with respect to any point of view regarding those matters. Instead, the Gag Order Provision only restricts her from making use of the New York incident and related orders in court filings, and/or before other government agencies, such as child welfare agencies; that is, in any *manner* that could conceivably instigate further litigation over that incident. Indeed, unlike the gag order in *S.B.*, the Gag Order Provision here does not restrict Appellant from publicly commenting on the New York Orders and related incident at all and, therefore, constitutes a narrower restriction than the gag order in *S.B.* Thus, as was the case in *S.B.*, the Gag Order Provision here is also a time, place, or manner restriction that is not subject to strict scrutiny and, therefore, the *O'Brien* test applies. Appellant's claim the Gag Order Provision is not content neutral is meritless.

Appellant's discussion of this issue only vaguely references the *O'Brien* test in the brief context of her citation to *S.B.* Nevertheless, we will address the Gag Order Provision under the *O'Brien* test out of an abundance of caution, in recognition of the importance of the First Amendment issues at stake.

We first consider whether the "regulation was promulgated within the constitutional power of government[.]" *O'Brien*, 391 U.S. at 377. As was the case in *S.B.*, we ascertain no reason why the trial court would lack the

constitutional authority to issue an order seeking to prevent harassing, vexatious litigation by a party in the context of an ongoing custody dispute, apart from the First Amendment issue under consideration. In any event, Appellant makes no such argument in her brief.

Next, under the second *O'Brien* factor, we contemplate whether "the regulation furthers an important or substantial governmental interest[.]" *O'Brien*, 391 U.S. at 377. Appellant argues that the trial court did not cite the protection of the parties' children to justify the Gag Order Provision, as had been recognized in *S.B.* as an important government interest at stake in that case. Appellant's Brief at 43. While Appellant is correct that the trial court did not explicitly cite the children's safety or wellbeing to justify the Gag Order Provision, there is nothing in the *S.B.* decision that limits such injunctions in custody disputes solely to those that serve the important government interests involving the protection of children.[4]

As cited by the trial court, *supra*, both Pennsylvania and federal courts have recognized the validity of injunctions designed to curb vexatious litigation. In addition to those authorities, we note that the United States Supreme Court has recognized that a "legitimate and important state interest" exists "in preventing . . . fraud, undue influence, intimidation, overreaching, and other forms of 'vexatious conduct[,]'" in the context of a First Amendment

---

[4] The trial court maintains that the Gag Order Provision was "arguably in the best interests of the children," but acknowledges that it did not make "an express finding to that effect." Trial Ct. Amended Op. at 20 n.14.

challenge to restrictions on solicitation by lawyers. ***Ohralik v. Ohio State B. Ass'n***, 436 U.S. 447, 462 (1978). In ***Procup v. Strickland***, 792 F.2d 1069 (11th Cir. 1986), the Eleventh Circuit considered an injunction against a state prisoner who had engaged in "ridiculously extensive" and "frivolous" litigation. ***Id.*** at 1070. Although the ***Procup*** Court rejected a complete ban on *pro se* lawsuits by the prisoner as unconstitutional, and remanded for the imposition of alternative sanctions, it recognized that there "should be little doubt that the district court has the jurisdiction to protect itself against the abuses that litigants like Procup visit upon it. Federal courts have both the inherent power and the constitutional obligation to protect their jurisdiction from conduct which impairs their ability to carry out" judicial functions. ***Id.*** at 1073.

Here, we recognize the trial court acted pursuant to a substantial and important government interest to prevent vexatious litigation by Appellant, particularly where her repetitive litigation began to exhaust the limited time and resources of the court over previously-decided matters, while simultaneously impeding Appellee's custody rights to the children by abuse of the temporary PFA process. Appellant had multiple opportunities to litigate the accusations related to the New York incident in both New York and Pennsylvania, all of which were ultimately unsuccessful. The trial court therefore had a substantial interest in curtailing unfettered, repetitive litigation over the same subject matter.

Under the third ***O'Brien*** factor, we consider whether the justification for the gag order was related to the content of the restricted speech. We conclude

that it was not. Appellant is not prohibited by the Gag Order Provision from speaking publicly about the New York Orders, or from complaining about the adverse judgments against her claims of abuse arising out of the New York incident. Appellant is only conditionally prohibited from repetitively relitigating those matters in the courts or before government agencies without leave of court to do so. This restriction does not target the content of her speech, but is instead designed to limit the manner of her expression in the narrow context of litigation and other government agency filings.

Finally, under the fourth *O'Brien* factor, we must consider whether the Gag Order Provision was narrowly tailored to prevent vexatious litigation by Appellant. The Gag Order Provision is narrowly tailored to limit only legal and governmental filings involving the previously-litigated incident and orders from New York, unlike the order in *S.B.*, which had prevented speech in most public settings about that case. Nothing in the Gag Order Provision prevents Appellant from speaking to those matters publicly, insofar as such speech could not fairly be deemed to be an attempt to prompt litigation or otherwise interfere with Appellee's custody. Furthermore, nothing in the Gag Order Provision prevents Appellant from seeking relief based on new matters or circumstances that might arise regarding the custody of the children or Appellant's own safety. Moreover, Appellant is even permitted by the Gag Order Provision to raise matters concerning the New York Orders and related proceedings by first seeking leave of court do so. Under these circumstances, we conclude that the Gag Order Provision was narrowly tailored to address

the important government interest of preventing further vexatious litigation by Appellant regarding the New York Orders and related incident that was impeding Appellee's custody of the children.

Accordingly, under the **O'Brien** test, Appellant's First Amendment rights were not infringed.  Consequently, her third claim also lacks merit.

Order affirmed.

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*

*Date: 10/13/2022*