J-A11006-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| BRYAN CAIN | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| BILLIE CAIN | : | |
| | : | |
| Appellant | : | No. 1597 MDA 2023 |

Appeal from the Order Entered November 1, 2023
In the Court of Common Pleas of York County Civil Division at No(s):
2020-FC-002885-03

BEFORE:  BOWES, J., STABILE, J., and MURRAY, J.

MEMORANDUM BY BOWES, J.:                    **FILED JUNE 27, 2024**

Billie Cain ("Mother") appeals *pro* se the November 1, 2023 order denying her petitions for contempt, which alleged that Bryan Cain ("Father") (collectively, "Parents") violated various aspects of the custody orders of December 15, 2020, January 22, 2021, March 4, 2021, June 30, 2021, and May 11, 2022, concerning Parents' natural son, C.N.C., born in 2014.[1]  The court's order also "clarified" certain aspects of the existing custody order governing Mother's contact with C.N.C.[2]  After careful review, we affirm.

---

[1]  The trial court and the litigants in this matter refer to the various custody orders by the date that the orders were dictated in open court, as opposed to the date of filing.  To avoid confusion, we note that we refer to the orders discussed in this writing by the dates of filing that appear on the docket.

[2]  Our precedent provides that "an order denying a petition for contempt" is final and appealable when it is "entered in relation to a prior final order."  **See Schultz v. Schultz**, 70 A.3d 826, 828 (Pa. Super. 2013) ("[T]he refusal of a
*(Footnote Continued Next Page)*

We glean the factual and procedural history of this controversy from the certified record. Parents were originally married but separated shortly after C.N.C.'s birth. Following their separation, Father has resided in Whitman, Massachusetts, while Mother has lived in Mt. Wolf, Pennsylvania. For the first approximately six years of his life, C.N.C. resided with Mother. The trial court has authored an apt summary of the events that then led the court to place C.N.C. in Father's sole legal and physical custody:

> York County Office of Children and Families (hereinafter, "YCF") received four referrals between February 20, 2020, and October 14, 2020, regarding Mother's mental health and concerns regarding whether Mother was adequately meeting C.N.C.'s basic needs. The referrals related to Mother's continuing belief that she and C.N.C. were infected with worms and parasites. . . . C.N.C. was taken to physicians many times over a period of ten months and treated several times at Mother's request to eradicate pinworms and other types of worms although no physician has documented the child to have worms or parasites. Hershey Medical Center had concerns that Mother could be suffering from delusional parasitosis related to herself and her son as well as possible Munchausen's syndrome.
>
> Although YCF offered Mother services to address her mental health issues, Mother refused all services. The dispositional order also noted that Mother contacted the police department sixteen times in 2020, alleging that there were intruders in the home, bombs in her backyard, her electronics having been hacked, her neighbors putting fireworks in her car hood, finding men's clothing in the back of her vehicle, and numerous other reasons. C.N.C. was placed in the temporary custody of YCF when Mother was arrested on October 21, 2020 . . . .

---

lower court to enter an order holding someone in contempt may be a final order, but only if the refusal is tantamount to denying the party requesting the order relief to which the party has a right under an earlier order.") (cleaned up). Instantly, Mother's contempt petitions implicated the final custody order in this matter and, thus, we find it is appealable as of right. *See id*.

Trial Court Opinion, 12/21/23, at 1-2 (cleaned up). Thereafter, Mother was released from custody and C.N.C. was returned to her care.

Based upon these events, YCF filed a dependency petition with respect to C.N.C., which culminated in hearings held on December 14 and 15, 2020. Although the dependency court did not adjudicate C.N.C. dependent, it transferred physical and legal custody of C.N.C. to Father. **See** N.T., 12/15/20, at 3-4.[3] The dependency court's order also included a number of provisions governing communications between Parents. **See id**. at 10 ("Communication protocols shall be attached to this order and incorporated into the order."). While we are able to infer that this December 15, 2020 order existed, it is not present in either the certified or reproduced records.

Contemporaneously, Father filed a custody complaint seeking primary physical and sole legal custody of C.N.C. On January 22, 2021, the court entered a custody order awarding Father primary physical and sole legal custody of C.N.C. and providing Mother with supervised partial physical custody three times per week. **See** Order, 1/22/21, at 3-4. This order also incorporated the terms of the December 15, 2020 order. **See id**. at 3.

On March 4, 2021, the trial court filed a follow-up order reducing Mother's periods of partial physical custody to twice per month. **See** Order, 3/4/23, at 2. Aside from this reduction in Mother's periods of partial physical

---

[3] This transcript appears in the certified record as Mother's Exhibit 36.

custody, the March 4, 2021 order "ratified in full" the custody terms set forth in both the December 15, 2021 order and the January 21, 2021 order. ***Id***.

On March 26, 2021, Mother's counsel withdrew their appearance. Thereafter, Mother operated *pro se* in prosecuting these proceedings.[4]

On or about June 30, 2021, Parents reached a stipulated resolution to Father's then-pending custody petition. By explicit reference, the resulting order largely preserved the status quo of physical and legal custody established by the prior custody orders. ***See*** Order, 6/30/21, at 2 (awarding Mother partial supervised physical custody "every other weekend").

On August 25, 2021, Father filed a custody modification petition "alleging that Mother's mental health and behavior had become an issue again." Trial Court Opinion, 12/21/23, at 3 (cleaned up). Specifically,

> Father indicated that Mother's behavior resulted in police involvement and her hospitalization on or around July 6, 2021, during one of Mother's physical custodial periods. Father's allegations included that Mother's behavior was increasingly bizarre and disruptive to C.N.C. in that C.N.C. is required to defecate into a receptable in the living room, so that Mother can inspect the contents, and Mother's insistence that C.N.C. be re-circumcised for no reason.

***Id.***; ***see also*** Father's Petition for Special Relief, 8/25/21, at ¶¶ 11-13. On May 11, 2022, the trial court filed an order reducing Mother's periods of partial physical custody to the first weekend of each month subject to strict

---

[4]  Our precedent provides that there is no right to counsel in custody proceedings. ***See Karch v. Karch***, 879 A.2d 1272, 1274 (Pa.Super. 2005).

supervisory guidelines. **See** Order, 5/11/22, at 1-3. The other terms governing custody of C.N.C. remained unaltered.

Between June 30 and October 19, 2023, Mother filed a succession of petitions for contempt and related addendums alleging that Father had violated the custody guidelines set forth by the court by denying Mother's scheduled visitations, interfering with Zoom calls between Mother and C.N.C., and limiting Mother's input concerning C.N.C.'s health and education.[5]

By way of overall relief, Mother requested that the court award her primary physical custody. **See** Petition for Finding of Contempt of Custody Order, 6/30/23, at 9 ("Mother[']s position is: Mother wants to exercise [p]rimary [p]hysical [c]ustody and have the child returned to her."); Petition for Finding of Contempt of Custody Order, 7/18/23, at 9 (same); Third Petition of Contempt, 8/18/23, at 9 ("Mother requests to bring [C.N.C.] home to live with Mother in Pennsylvania, where [C.N.C.] was successful and flourishing.").

On October 24, 2023, the trial court held a consolidated hearing on Mother's contempt filings at which Parents each testified. Mother's testimony

_____

[5] Specifically, Mother filed a petition for contempt on June 30, 2023, which resulted in the trial court directing Parents to participate in conciliation. **See** Order, 7/13/23, at 1-2. Mother filed a second petition for contempt on July 18, 2023, wherein she largely repeated the claims set forth in her first filing. Mother filed her third contempt petition on August 18, 2023, and submitted a follow-up addendum to that filing on August 25, 2023. She filed two further addendums on September 7 and October 19, 2023, respectively. Altogether, Mother's various allegations concerning contempt span six separate filings that are largely repetitive and duplicative of one another.

and arguments to the court were significantly disorganized, as she referred interchangeably to the various contempt-related filings while being repeatedly unable to reliably or timely identify the specific dates and circumstances of her many allegations. *See* N.T., 10/24/23, at 11-65.

The same day, the trial court filed an order denying Mother's various requests for contempt-related relief. *See* Order, 10/24/23, at 1-2. On November 21, 2023, Mother filed a timely notice of appeal along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). On December 21, 2023, the trial court submitted an opinion pursuant to Rule 1925(a)(2)(ii).

Mother has raised the following issues for our consideration:

1. Whether the trial court erred or abused its discretion in its finding of contempt?

2. Whether the trial court adequately weighed the applicable evidence?

3. Whether the trial court adequately considered and examined the orders on record from hearings held on December 15, 2020, January 22, 2021, March 4, 2021, June 30, 2021, and May 11, 2022?

4. Whether the trial court sufficiently stated its rationale for its lack of finding of contempt?

5. Whether the trial court failed to consider all petitions submitted and forwarded to October 24, 2021 [sic] hearing.

6. Whether the trial court failed to correctly apply the law?

7. Whether the trial court has shown bias or ill will in its decision-making?

8.     Whether the trial court erred or abused its discretion by modifying orders?

Mother's brief at 5 (cleaned up; issues reordered for ease of disposition).

Our standard of review regarding a trial court's finding of contempt is "very narrow" and "limited to a determination of whether the trial court abused its discretion." *Gross v. Mintz*, 284 A.3d 479, 489 (Pa.Super. 2022). An abuse of discretion occurs where the trial court, "in reaching its conclusion, overrides or misapplies the law or exercises judgment which is manifestly unreasonable, or reaches a conclusion that is the result of partiality, prejudice, bias, or ill will as shown by the evidence of record." *Id*.

We also discern the trial court's contempt finding was civil in nature.[6] In order to sustain a finding of civil contempt under Pennsylvania law,

---

[6] The trial court did not identify the nature of these contempt proceedings. Generally, "[c]ontempt proceedings may be criminal or civil in nature." *County of Fulton v. Secretary of Commonwealth*, 292 A.3d 974, 1027 (Pa. 2023). This distinction is "extremely important" and determines both "the due process rights of the alleged contemnor" and the relevant burdens of proof. *Id*. (cleaned up). While there is no bright-line distinction, the fundamental and controlling difference between civil and criminal contempt is the "dominant purpose" of the sanctions requested by the complaining party. *Id*. Overall, "where the act of contempt complained of is the refusal to do or refrain from doing some act ordered or prohibited primarily for the benefit of a private party, proceedings to enforce compliance with the decree of the court are civil in nature." *Knaus v. Knaus*, 127 A.2d 669, 672 (Pa. 1956). Our Supreme Court has also enumerated five additional factors that, if present, suggest that a contempt proceeding is civil rather than criminal:

(1) Where the complainant is a private person as opposed to the government or a governmental agency; (2) where the proceeding is entitled in the original injunction action and filed as a

*(Footnote Continued Next Page)*

the complainant must prove certain distinct elements by a preponderance of the evidence: (1) that the contemnor had notice of the specific order or decree which he is alleged to have disobeyed; (2) that the act constituting the contemnor's violation was volitional; and (3) that the contemnor acted with wrongful intent. Moreover, a court may exercise its civil contempt power to enforce compliance with its orders for the benefit of the party in whose favor the order runs but not to inflict punishment. A party must have violated a court order to be found in civil contempt.

*Id.* The complaining party has the burden of proving a violation by a preponderance of evidence. *See Garr v. Peters*, 773 A.2d 183, 189 (Pa.Super. 2001). Finally, "[i]n order to support a finding of contempt, the order or decree which the contemnor has been held to have violated must be **definite, clear, and specific** – leaving no doubt or uncertainty in the mind of the contemnor of the prohibited conduct." *Marian Shop, Inc. v. Baird*, 670 A.2d 671, 673 (Pa.Super. 1996) (emphasis in original).

With these basic legal precepts in mind, we turn to Mother's claims for relief. Although stated and set forth as separate issues, Mother's first seven

---

continuation thereof as opposed to a separate and independent action; (3) where holding the defendant in contempt affords relief to a private party; (4) where the relief requested is primarily for the benefit of the complainant; and (5) where the acts of contempt complained of are primarily civil in character and do not of themselves constitute crimes or conduct by the defendant so contumelious that the court is impelled to act on its own motion.

*Fulton*, *supra* at 1028 (citation and quotation marks omitted). Instantly, the dominant purpose of the sanctions sought by Mother related to enforcing her custody entitlements as a private litigant. Accordingly, we conclude that these contempt proceedings are clearly civil in nature. *See id.*

claims collectively challenge the factual and legal basis of the trial court's denial of her contempt petitions. *See* Mother's brief at 33-44, 47-49. Accordingly, we address these issues together.

Mother's arguments concern Father's alleged failures to abide by various aspects of the court's custody orders, namely: (1) denying Mother physical custody of C.N.C. during a school break that lasted from June 23 through July 5, 2023; (2) denying Mother partial physical custody of C.N.C. on the weekend of April 6 to April 9, 2023; (3) failing to provide Mother with three Zoom calls with C.N.C. every week; (4) failing to confer with Mother regarding C.N.C.'s course of psychiatric medication; (5) declining to send weekly update emails to Mother concerning C.N.C.'s well-being; (6) not responding to all of Mother's communications within forty-eight hours; and (7) not assisting Mother in accessing C.N.C.'s school records. *See* Mother's brief at 20-32.

The trial court did not credit Mother's claims, reasoning that her arguments did not satisfy all three of the required elements of civil contempt:

> The court believes these elements were not met in Father's case. Either Mother alleged a violation that was not ordered or cited a provision that was overridden by a subsequent order. Even where there was a possible violation of an order, the court did not find that Father's act was volitional or with wrongful intent.

Trial Court Opinion, 12/21/23, at 6. Father essentially echoes the trial court's position concerning Mother's claims. *See* Father's brief at 7-20.

From the outset of our analysis, we note the non-linear structure of the trial court's custody terms. As detailed above, the various provisions

governing legal and physical custody of C.N.C. are not contained within a single, definitive order that is subject to ready review. Instead, the court's directives are spread across five separate inconsistent orders, which must be read collectively to parse the governing parameters. Even then, certain elements of the arrangement must be inferred. In sum, the court's custody scheme has created evident confusion.

Indeed, while the trial court maintains that several of the custody provisions referenced by Mother are "moot" or have been replaced by its subsequent orders, our review indicates that each of the custody orders entered by the trial court remain fully in force. *See* Order, 5/11/22, at 1 (reiterating the provisions of the custody order entered on June 30, 2021); Order, 6/30/21, at 1-5 (incorporating generally by reference various custody provisions entered on March 4, 2021); Order, 3/4/21, at 2 ("It's the order of [c]ourt in this matter that [the dependency court's] order of December 15, 2020[,] and the interim order of January 21, 2021 . . . are ratified in full" save for minor changes to Mother's periods of partial physical custody); Order, 1/22/21, at 3 ("Legal and physical custody shall remain in accordance with the [o]rder by [the dependency court] dated December 15, 2020[.]"). As noted above, we are unable to ascertain the specific terms of the December 15, 2020 custody order due to its absence from the appellate record.

Stated succinctly, the trial court's custody orders supplement one another as opposed to supplanting. Each subsequent order adds additional

provisions, requirements, and obligations without clearly indicating whether, or even which of, the older custody provisions are being replaced.

Against this backdrop, we turn to Mother's claims for relief, and as explained, *infra*, we conclude that the terms of the governing custody orders are too uncertain, contradictory, and/or confusing, to find that Father was clearly aware of the prohibited conduct.[7] **See Baird**, **supra** at 673 (Pa.Super. 1996).

In her first claim noted above, Mother asserts that she was to have partial physical custody of C.N.C. during the entirety of a two-week school vacation that lasted from June 23 through July 5, 2023. However, Mother's actual entitlement to partial physical custody on these dates is unclear based upon the conflicting terms of the custody orders. The January 22, 2021 custody order provides that Mother is only entitled to "a two-hour period of custody" during C.N.C.'s school holidays, without further explanation. Order, 1/22/21, at 6. Concomitantly, the June 30, 2021 custody order simultaneously provides that C.N.C. "has several one-week breaks during the school year" and that C.N.C. "shall visit [M]other in Pennsylvania during said

_____

[7] As noted in the body of this memorandum, the trial court denied Mother's contempt petition because it found that Mother failed to cite a governing provision that Father violated with wrongful intent. Trial Court Opinion, 12/21/23, at 6. To the extent that our holding deviates from the trial court's rationale, we note that this Court may affirm the trial court on any basis supported by the record. **See P.J.A. v. H.C.N.**, 156 A.3d 284, 293 n.6 (Pa.Super. 2017).

breaks." Order, 6/30/21, at 3. Further complicating matters, Father's testimony indicates C.N.C. is no longer enrolled in a school that utilizes the one-week break schedule referred to in the June 30, 2021 order. *See* N.T., 12/7/23, at 23, 70-71. Overall, Mother's entitlement to partial physical custody on the dates in question is not well-established or clear from the face of the certified record.

Similarly, while Mother claims that she was entitled to have partial physical custody of C.N.C. for the Easter holiday from April 6 through April 9, 2023, the custody orders do not support this assertion. The May 11, 2022 order provides that Mother will have physical custody on "the first weekend of each month," while the days in question actually fell upon the second weekend of April 2023. Order, 5/11/22, at 1. Easter is also not enumerated as a holiday during which Mother is entitled to custody pursuant to the January 22, 2021 interim custody order. *See* Order, 1/22/21, at 6. Thus, the orders do not clearly evince that Mother was entitled to partial physical custody for the Easter holiday.

The extent of Mother's entitlement to Zoom calls with C.N.C. is also amorphous. The January 22, 2021 custody order states that "Mother shall be provided with daily Zoom calls, to happen once a day, at least five days a week." Order, 1/22/21, at 8. The March 4, 2021 order, however, purported to adopt the provisions of the January 22, 2021 order, while also directing that "Mother is to have phone or FaceTime or Zoom or equivalent phone or

video times with [C.N.C.]  Those are to be three per week.  They will be at 7:00 p.m. or as close to that time as can be reasonably arranged."  Order, 3/4/21, at 3.  Thereafter, the June 30, 2021 order provided that "[each parent will have reasonable rights of telephone calls when [C.N.C.] is with the other parent" in conformity with the March 4, 2021 order.  Order, 6/30/21, at 3. The conjunctive nature of these orders leaves the precise number, time, and manner of these mandated interactions subject to speculative interpretation.

Mother also avers that Father has failed to heed Mother's objections concerning C.N.C. being prescribed medications for issues related to suicidal ideation.  *See* Mother's brief at 23 ("Father made the decision to start [C.N.C.] on medication for [s]uicidal [t]endencies in May 2023, prior to speaking to Mother regarding said medication/situation.").  Mother, however, does not have a clear entitlement to substantive input of this nature.  The January 22, 2021 custody order requires Parents to "confer with the other on all matters of importance relating to [C.N.C.'s] health, maintenance, and education with a view towards obtaining and following a harmonious policy in the child's education and social adjustments."  Order, 1/22/21, at 9.  However, Father was awarded sole legal custody of C.N.C., which explicitly includes the authority to make independent medical decisions.  *See id*. at 3; *see also* Order, 5/11/22, at 1; Order, 6/30/21, at 2; Order, 3/4/21, at 2.

Regarding parental communications, Mother claimed that Father is violating the custody terms by not providing her with weekly email updates

concerning C.N.C.'s well-being, failing to respond to her communications within forty-eight hours, and not copying her on all communications concerning C.N.C.'s education and health. **See** Mother's brief at 25 ("Father willfully violated the orders by not complying with [c]ommunication [g]uidelines as outlined in the orders."). These alleged requirements, however, are derived solely from the terms of the December 15, 2020 order, which this Court is unable to review. Accordingly, Mother's arguments on this point are simply not supported by the terms of the available orders.[8]

Finally, Mother also submits that Father has failed to assist her in obtaining records from C.N.C.'s school. **See** Mother's brief at 27. Our review confirms that the court's January 22, 2021 order states that "Mother shall have access to [C.N.C.'s] mental, dental, religious, and school records." Order, 1/22/21, at 4. The underlying conflict, however, does not relate to Mother being denied access to a particular piece of information. To the contrary, the record reflects that Mother is able to communicate with C.N.C.'s educators and that Father is regularly sharing documentation related to C.N.C.'s education. **See** Mother's Exhibits R01-R18. Rather, Mother's

_____

[8] Assuming, *arguendo*, the December 15, 2020 order supported Mother's arguments, it would still be unclear whether the trial court intended to preserve these requirements given the intervening entry of orders and the changes in the circumstances of the case during that period. **See**, **e.g.**, N.T., 10/24/23, at 37-38, 46 (arguments concerning expiration of these requirements that the trial court credited in passing); Trial Court Opinion, 12/21/23, at 6 (same).

- 14 -

complaint stems from Father's refusal to sign a release from C.N.C.'s school that would impact Mother's access to information and communication with the school. *See* N.T., 10/24/23, at 41-46; Mother's Exhibits R01-R18.

Critically, however, there is no copy of this parental release present in the certified record and the underlying terms are not discussed with specificity elsewhere in the certified record. Further compounding this uncertainty, it remains unclear whether the terms of the January 22, 2021 order referenced by Mother would compel Father to sign the at-issue release when there is no dispute that he is providing Mother with the records. The order speaks to Mother's right of access to information but does not explicitly address the manner of transmission or Father's arguable obligations.

In sum, considering the foregoing discussion, we discern no merit in Mother's various claims regarding Father's alleged contempt due to the uncertain, contradictory, and/or confusing terms of the governing custody orders discussed at length above. *See Baird*, 670 A.2d at 673. Accordingly, no relief is due with respect to Mother's first seven claims.

Mother's eighth and final claim for relief concerns the following clarification that appeared in the trial court's contempt order:

> Additionally, the court wants to clarify, that the provision in the operative order for three Zoom visits per week is for weeks when Mother has no personal physical custody of [C.N.C.]. In any week in which she has physical custody time with [C.N.C.], she will have one Zoom visit for every three days that she does not have physical custody within the calendar week. . . .

- 15 -

Order, 10/24/23, at 2. Mother asserts that it was inappropriate for the trial court to enact such a change during contempt proceedings. *See* Mother's brief at 47 ("Regarding [c]ontempt [c]ourt, Pennsylvania law clearly states a change in custody during a hearing for contempt may not be had.").

Plainly, the trial court's clarification did not modify the parties' respective rights to physical custody or legal custody. Instead, the court further defined its expectations of the parties in relation to Mother's video contact with C.N.C. during the weeks that she is not exercising physical custody. Throughout this custody litigation, the parties' interpretation of the relevant provision has been inconsistent, with Father permitting liberal video contact during some of his custodial periods and reading the relevant provision more strictly on other occasions where Mother would attempt to initiate a Zoom call immediately after returning the child to Father's custody. The trial court's clarification simply delineated the parties' existing rights, *i.e.*, Mother is entitled to three Zoom visits every week that she is not the custodial parent but those calls are reduced on the weeks that she exercised physical custody for part of the week and return the child to Father.[9] Thus, Mother's argument that the court's explanation of its expectations is tantamount to a custody modification is unconvincing.

---

[9] On the weeks that Mother returns C.N.C. to Father mid-week, "she will have one Zoom visit for every three days that she does not have physical custody within the calendar week." Order, 10/24/23, at 2.

Furthermore, even to the extent that the trial court's clarification could be interpreted as a modification of physical or legal custody, which it is not, there is no merit to Mother's argument. As a general matter, Pennsylvania precedent disfavors custody modifications that arise from contempt proceedings. *See J.M. v. K.W.*, 164 A.3d 1260, 1267 (Pa.Super. 2017) (collecting cases). Nonetheless, it is still within the remit of a trial court to modify a custody award as a consequence of contempt proceedings so long as the parties to the litigation receive express notice that such custody modifications are being placed at-issue and the custody modification is in the best interests of the child. *Id*.

Instantly, Mother's own contempt petitions requested significant custody modifications, such that she had notice of the potential for such changes during the contempt proceedings that she initiated. *See* Petition for Finding of Contempt of Custody Order, 6/30/23, at 9; Petition for Finding of Contempt of Custody Order, 7/18/23, at 9; Third Petition of Contempt, 8/18/23, at 9. Furthermore, Mother has not raised any colorable allegations challenging the court's custody modification on substantive grounds. Accordingly, no relief is due with respect to Mother's eighth and final issue.

Based upon the foregoing, we observe no abuse of discretion or error of law in the trial court's order denying Mother's contempt petitions and clarifying the terms of its custody order.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 06/27/2024