J-A06035-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| CHRISTINE L. COULTER N/K/A CHRISTINE LAURAMAE QUICK | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | No. 1051 WDA 2025 |
| BENJAMIN R. COULTER | : | |

Appeal from the Order Entered July 18, 2025
In the Court of Common Pleas of Jefferson County Civil Division at No(s):
2014-00929

BEFORE:  OLSON, J., MURRAY, J., and BECK, J.

MEMORANDUM BY BECK, J.:                          **FILED: MAY 1, 2026**

Christine L. Coulter n/k/a Christine Lauramae Quick ("Mother") appeals from two separate orders entered on July 18, 2025, in the Jefferson County Court of Common Pleas ("trial court").  The first order modified the custody awards with respect to her daughters, B.C., born in June 2013, and C.C., born in January 2012, whom she shares with Benjamin R. Coulter ("Father").  The second order held Mother in contempt for violating a prior custody order entered by the trial court, awarded Father $3,800 in attorney's fees and costs, and sanctioned Mother an additional $1,200 in penalties.[1]  Because we discern

---

[1] Generally, taking one appeal from separate final orders is improper and discouraged.  ***See General Electric Credit Corp. v. Aetna Cas. & Sur. Co.***, 263 A.2d 448, 452 (Pa. 1970).  The orders on appeal in this matter were both filed on July 18, 2025, at the same trial court docket number.  We have
*(Footnote Continued Next Page)*

J-A06035-26

no abuse of discretion, we affirm the child custody order. However, based upon our conclusion that 23 Pa.C.S. § 5337 of the Child Custody Act ("the Act") is inapplicable in this case, we vacate the order holding Mother in contempt for failing to comply with the notice provisions of section 5337 and remand for further proceedings consistent with this decision.

## Procedural History

The certified record reveals that Mother initiated the underlying custody action in 2014, simultaneously with a divorce action. Protracted litigation ensued. By way of a brief summary of the first eight years of these proceedings, Mother exercised primary physical custody and Father partial physical custody of B.C. and C.C. until June 8, 2022, when the trial court issued an agreed-upon custody order awarding the parties shared physical custody on an alternating weekly basis.[2] In October 2022, Father filed a petition for contempt and sanctions against Mother alleging that she violated

---

explained that "appellate courts have not generally quashed [such] appeals, provided that the issues involved are nearly identical, no objection to the appeal has been raised, and the period for appeal has expired." *In the Interest of P.S.*, 158 A.3d 643, 648 (Pa. Super. 2017) (quoting *K.H. v. J.R.*, 826 A.2d 863, 870 (Pa. 2003)). In this case, we disapprove of Mother's procedural error. However, we recognize that the issues are intertwined, and Father did not object to the single appeal from the two orders. In addition, the statutory period allowed for appeal has expired. Thus, we consider the appeal from these two orders on the merits.

[2] The trial court awarded the parties shared legal custody of B.C. and C.C throughout the underlying matter. Mother does not contest the legal custody portion of the underlying custody order in this appeal.

- 2 -

the June 8, 2022 order. In March 2023, prior to the contempt hearing, Father filed a custody modification petition requesting primary physical custody. The trial court held a contempt hearing approximately one year after Father's filing, found Mother in contempt, and delayed its ruling on sanctions until after the custody trial. Trial Court Order, 10/13/2023.

The custody trial occurred on January 4, 2024. By order dated February 8, 2024 ("existing custody order"), the trial court maintained the parties' shared physical custody awards on the same alternating weekly schedule. In deciding not to modify custody, the trial court particularly noted that Mother resided in the home of Paula Quick, her stepmother ("Grandmother"), who assisted in overseeing B.C.'s and C.C.'s homework and other needs.[3] Findings of Fact, 2/8/2024 (addressing 23 Pa.C.S. § 5328(a)(4)).

By separate order, also dated February 8, 2024, the trial court, having previously held Mother in contempt of the June 8, 2022 agreed-upon order, sanctioned her in the amount of $3,000. Neither party appealed the existing custody order or the contempt order.

_____

[3] The trial court added other provisions to the existing custody order to assist with compliance. *See* Findings of Fact and Conclusions of Law, 2/9/2024, ¶ 6 ("At the contempt hearing on October 11, 2023, it was apparent that the parties, because of their lack of communication, could not comply with the intricacies of the June 8, 2022[] [o]rder. If they did not modify the order, there would be continual contempts with no relation to the best interest of children.").

The pleadings giving rise to the subject orders soon followed. On April 29, 2024, Father filed a petition for contempt and sanctions against Mother alleging that she violated the existing custody order by: (1) "pulling" B.C. and C.C. from school one day to travel to Splash Lagoon, a water park resort; (2) permitting B.C. to miss a Girl Scout activity involving horseback riding; (3) permitting B.C. to miss a Girl Scout activity involving an outing to the Indiana County airport; (4) purchasing iPhones for B.C. and C.C. and not monitoring their use; and (5) failing to take B.C. and C.C. to their six-month dental appointment and being a "no call, no-show" for the appointment. Petition for Contempt, 4/29/2024, ¶¶ 7, 37-39.

On May 28, 2024, Father filed another contempt petition alleging that Mother violated the existing custody order by failing to provide notice of her move from Punxsutawney, Jefferson County, to Smicksburg, Indiana County, Pennsylvania. The trial court issued rules to show cause and scheduled a single hearing to resolve both contempt petitions. On September 13, 2024, prior to the scheduled hearing, Father filed a modification petition again requesting primary physical custody of B.C. and C.C. The trial court scheduled a consolidated evidentiary hearing for April 2, 2025.

By the date of the hearing, Father had filed three additional contempt petitions against Mother, which the trial court consolidated with the other still-pending petitions. Specifically, on October 1, 2024, Father filed a petition alleging that Mother violated the existing custody order by failing to notify him

- 4 -

about C.C.'s diagnosis of a tooth abscess and treatment with antibiotics. On October 11, 2024, Father filed a petition alleging that Mother violated the existing custody order by: (1) failing to notify him that she changed B.C.'s and C.C.'s dental provider and (2) failing to respond to his messages on the Our Family Wizard ("OFW") application within twenty-four hours. On November 20, 2024, Father filed a petition alleging that Mother violated the existing custody order by: (1) relocating to Smicksburg without his consent or the trial court's approval and (2) failing to notify him of her purported change of address within twenty-four hours.

The hearing on the subject petitions occurred on April 2 and 7, 2025, wherein the trial court limited the evidence to "events since the date of my last hearing through the present." N.T., 4/2/2025, at 4. B.C. and C.C., then eleven and thirteen years old, testified separately in camera. *See* N.T., 4/2/2025, at 270, 283. Father testified on his own behalf and presented documentary evidence. He further presented the testimony of his wife, Heather Coulter ("Stepmother"), and two employees of the Punxsutawney School District—Kelly Surkala and Samantha Evans. Mother testified during the hearing in favor of maintaining the shared physical custody award, and she also presented documentary evidence. In addition, Mother presented the testimony of Grandmother; Dustin Fetterman ("Fetterman"), Mother's paramour with whom she shares a son born prematurely in July 2024; and Tammy Swanson ("Swanson"), Fetterman's mother.

**Facts**

The testimony at the hearings revealed that Father and Stepmother have been in a romantic relationship for eight years, and they married in 2022. N.T., 4/2/2025, at 202. They share a seven-year-old daughter and reside in a home that they purchased five years ago in Valier, Jefferson County, Pennsylvania, which is in the Punxsutawney School District. *Id.* at 5, 253.

Beginning in 2019, Mother resided in Grandmother's home which is also located in the Punxsutawney School District. N.T., 4/7/2025, at 24, 66; *see also* Finding of Fact and Conclusions of Law, 2/9/2024, ¶ 1. In approximately March 2024, however, Mother and Fetterman purchased a home in Smicksburg, which is a ten-acre property located in the Armstrong School District. N.T., 4/7/2025, at 51, 68, 71, 76; N.T., 4/2/2025, at 21. As many as seven children reside with Mother and Fetterman at any given time, including their eight-month-old son, Fetterman's two daughters from a prior marriage, Mother's daughter from a prior relationship, occasionally, Mother's son from a separate relationship, and B.C. and C.C.. N.T., 4/7/2025, at 12, 46, 67. Each child has his or her own bedroom in Mother's house. *Id.* at 49.

Since August of 2024, Mother has been employed as a contract certified nursing assistant, which requires her to work two sixteen-hour shifts every weekend from 7:00 a.m. until 11:00 p.m. N.T., 4/7/2025, at 59. Fetterman works for a drilling company that requires him to "travel to remote locations, [and] work on [a] drilling rig. I'm gone for two weeks at a time [and] then I

come home for two weeks." *Id.* at 47. Fetterman explained that during the two-week periods that he is home, he has no professional responsibilities. *Id.*

On weekends when Mother and Fetterman are both working, B.C. and C.C. stay overnight at Grandmother's house, which she testified occurs approximately one weekend per month. N.T., 4/2/2025, at 26-27. In addition, Grandmother testified that C.C. "probably stays one or two nights" in her home during Mother's custodial weeks. N.T., 4/7/2025, at 42.

During the 2024-25 school year following Mother's move, B.C. and C.C. were in the fifth and seventh grades, respectively, and continued to attend the Punxsutawney School District.[4] N.T., 4/2/2025, at 248. Ms. Surkala, the director of transportation of the Punxsutawney School District, testified that she and Mother spoke in August 2024, prior to the start of the school year, during which Mother requested that Grandmother's address remain listed as B.C.'s and C.C.'s residence even though Mother had moved to the Armstrong School District. *Id.* at 171. Ms. Surkala testified:

> I explained to her that we can't do that since [Mother, B.C., and C.C. are] not living there. I said that if they wanted the kids to stay in [Punxsutawney School District] they would have to use [Father's address] and that if she chose her [new] address the kids would have to enroll in Armstrong School District.
>
> And then [Mother] said that she would be driving [B.C. and C.C.] to and from school on her days so just use [Father's]

---

[4] The Punxsutawney School District designates high school as seventh through twelfth grade. *See* N.T., 4/2/2025, at 249. Therefore, C.C., the parties' older daughter, is in a different school than B.C. and on a different school bus.

address[,] so that's what we did so the girls could stay in [Punxsutawney School District].

*Id.* Thereafter, however, Mother continued to request that the Punxsutawney School District list Grandmother's address. *Id.* at 172. Specifically, Ms. Evans, who oversees child custody paperwork and home address changes for students in the Punxsutawney School District, testified that Mother explained that she, B.C. and C.C. have "two residences now," i.e., her property in Smicksburg and Grandmother's home. *Id.* at 184-85. Ms. Evans stated that, to this end, Mother provided the Punxsutawney School District with a property rental agreement dated October 1, 2024, between Grandmother, as landlord, and Mother, as tenant. *Id.* at 185. Consequently, the district permitted B.C.'s and C.C.'s bus stop to remain at Grandmother's address during Mother's custodial weeks.[5]

The certified record reflects that Father similarly relies upon the assistance of his family for B.C.'s and C.C.'s school transportation during his periods of physical custody. During Father's custodial weeks, he and Stepmother awaken B.C. and C.C. at 5:15 a.m. every Monday through Thursday and take them to their paternal grandmother's house in Coolspring,

---

[5] Mother testified that "most mornings" she drives B.C. and C.C. to school. N.T., 4/7/2025, at 77. However, Mother explained that when B.C. and C.C. sleep overnight at Grandmother's house, then they take their respective school buses the next morning. *Id.* Mother testified that the afternoon bus stop remains at Grandmother's house, and that she picks them up from there and takes them to her house. *Id.*

Pennsylvania,[6] which is also located in the Punxsutawney School District, for their morning bus stop. N.T., 4/2/2025, at 94-95. On these days, B.C. and C.C. are returned to their paternal grandmother's address in the afternoon, and Father picks them up there at the end of his workday. *Id.* at 94, 106.

Although the record reveals that B.C. and C.C. have a history of poor academic performance and participation, neither child had a grade on her report card below eighty-seven percent during the most recent marking period. N.T., 4/2/2025, at 104-05. Father claimed that his daughters' improvement was because of his and Stepmother's efforts. *Id.* at 156. Father explained that he and Stepmother call the children during Mother's custodial periods "once or twice a week to make sure" that they have completed their homework. *Id.* at 71. Otherwise, Father testified that the children's homework would remain unfinished during Mother's periods of custody, and they would need to complete their assignments during his custodial weeks. *Id.* at 71-72. Overall, Father testified that Mother has not contributed at all to B.C.'s and C.C.'s academic improvement. *Id.* at 156.

### Trial Court Decisions and Issues on Appeal

By order dated and filed on July 18, 2025, the trial court awarded Father primary physical custody during the school year and Mother partial physical

_____

[6] Father and Stepmother are employed at the same retail store, and they both work every Monday through Thursday from 6:00 a.m. to 4:30 p.m. N.T., 4/2/2025, at 6, 94.

custody on alternating weekends. The court ordered that the parties share physical custody during the summer, as follows:

> During the summer vacation in 2026 and thereafter, Father will have custody of the children until the Sunday following the first full week of summer vacation at 7:00 p.m. Mother will then have custody of the children until the second Saturday of July at 7:00 p.m. Father will then have custody [of] the children for the next two weeks following that Saturday at 7:00 p.m. Mother will then take custody of the children until 2:00 p.m., the Saturday one week prior to the first day of school.

Trial Court Order (custody), 7/18/2025, ¶ 2(a).

By separate order filed the same day, the trial court held Mother "in contempt of court as set forth in the Findings of Fact and Conclusion of the Law." Trial Court Order (contempt), 7/18/2025. The trial court held Mother in contempt for violating the existing custody order with respect to the allegations in Father's petitions filed on April 29, May 28, and October 11, and November 20, 2024.[7] It denied Father's October 1, 2024 contempt petition regarding Mother's purported failure to notify him about C.C.'s tooth abscess. With respect to sanctions, the trial court's contempt order provided that Mother

> shall pay to [Father] the amount of $3,800.00 for attorney's fees and costs and an additional $1,200.00 in penalties for her contemptuous behavior. This sum of $5,000.00 shall be added to

---

[7] The court did not, however, find Mother in contempt for allowing the children to miss school to go to Splash Lagoon. The trial court found that the conduct occurred on February 9, 2024, which was the same day the existing custody order was filed; thus, "her conduct could not have been intentional when she would not have been aware of the order until after returning from Splash Lagoon." Findings of Fact and Conclusions of Law, 7/18/2025, at 13.

- 10 -

[Mother]'s child support arrears to be collected along with those arrears.

*Id.*

On August 18, 2025, Mother timely filed a notice of appeal and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). The trial court filed its Rule 1925(a) opinion on October 2, 2025.

Mother presents the following issues for review:

1. [Whether] the trial court erred by failing to apply appropriate legal standard in considering a petition for modification of an existing custody order.

2. [Whether] the trial court erred in determining the best interest of [B.C. and C.C.] are met by awarding primary physical custody to [Father].

3. [Whether] the trial court erred by failing to adequately address all relevant custody factors, specifically by failing to address [B.C.'s and C.C.'s] clear preferences for the current order to remain in effect, by relying on facts not in evidence and by omitting consideration of relevant evidence and testimony.

4. [Whether] the trial court erred by overruling and/or not addressing [Father]'s failure to include a signed verification with the petition for modification and with numerous petitions for contempt.

5. [Whether] the trial court erred by finding [Mother] in contempt regarding all of the petitions filed by [Father] on the relevant evidence presented and through [Father]'s own admissions during the hearing.

Mother's Brief at 17 (unnecessary capitalization omitted).

**Custody Modification**

In her first three issues, Mother argues that the trial court abused its discretion by modifying her periods of physical custody. In reviewing these issues, "[o]ur scope is of the broadest type and our standard is abuse of discretion." *White v. Malecki*, 296 A.3d 1210, 1213 (Pa. Super. 2023) (citation omitted). This Court has explained:

> We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

*Id.* (citation omitted).

With respect to child custody cases, the "paramount concern is the best interest of the child involved." *Rogowski v. Kirven*, 291 A.3d 50, 61 (Pa. Super. 2023) (quotation marks and citation omitted). "This standard requires a case-by-case assessment of all the factors that may legitimately affect the physical, intellectual, moral and spiritual well-being of the child." *M.J.M. v. M.L.G.*, 63 A.3d 331, 334 (Pa. Super. 2013) (citation omitted).

In determining a child's best interests, trial courts are governed by the Act, which, in cases involving a question of relocation,

> contains two sets of factors the trial court must consider, depending on the type of action. *See* 23 Pa.C.S.A. § 5328(a)(1)-(16); *see also* 23 Pa.C.S.A. § 5337(h). Section 5328(a) provides: "In ordering any form of custody, the court

shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including [factors 1 through 16.]" *Id.* Separately, Section 5337(h) enumerates ten factors a court must consider in determining whether to grant a proposed relocation (again giving weighted consideration to those factors which affect safety).

*White*, 296 A.3d at 1213.

<u>Burden of Proof – Custody and Relocation</u>

In her first issue, Mother argues that the trial court erred by applying a shared burden of proof between the parties rather than placing the burden upon Father to prove, by a preponderance of the evidence, that awarding him primary physical custody served their daughters' best interests. Mother's Brief at 22-23. Mother fails to support her claim with citation to legal authority. Therefore, we conclude that she has waived this claim. *See* Pa.R.A.P. 2119(a) (requiring that appellate argument include "discussion and citation of authorities as are deemed pertinent"); *In re M.Z.T.M.W.*, 163 A.3d 462, 465-466 (Pa. Super. 2017) (citation omitted) (stating that a claim is waived where an appellate brief fails to provide any discussion of the claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review).

Nonetheless, Mother's claim would fail even if not waived. To the extent Mother maintains the trial court erred in applying a shared burden of proof, the law of this Commonwealth belies her claim. *See White*, 296 A.3d at 1215 ("[E]ach parent shares the burden of proving, by a preponderance of the

evidence, that an award of custody to him or her would serve the best interests of the [c]hild.") (citation omitted). Therefore, her contrary contention is also meritless.

She further asserts that the trial court erred by deeming her move to Smicksburg a "relocation" under 23 Pa.C.S. § 5322 ("Definitions") of the Act. Mother's Brief 25-28. Importantly, however, Mother acknowledges that the trial court "did not base its decision to modify custody specifically on the relocation." *Id.* at 28. Nevertheless, she baldly claims that the trial court's conclusion on relocation "incorrectly informed its decision on the overall decision to modify custody." *Id.* at 27-28.

Section 5322 of the Act defines "relocation" as "[a] change in a residence of the child which significantly impairs the ability of a nonrelocating party to exercise custodial rights." 23 Pa.C.S. § 5322. The trial court in this case found that Mother's move to the Smicksburg address constituted a "relocation," and that Mother was thus required to file a notice of relocation with an affidavit and counter-affidavit pursuant to section 5337(c) and (d) of the Act. *See* Findings of Fact and Conclusions of Law, 7/18/2025, at 19 (unpaginated); *see also* 23 Pa.C.S. § 5337(c) (Notice); 23 Pa.C.S. § 5337 (d) (Objection to proposed relocation). Accordingly, the trial court also addressed the ten statutory relocation factors set forth at section 5337(h). *See* Findings of Fact and Conclusions of Law, 7/18/2025, at 19-20 (unpaginated).

We agree with Mother that the trial court erred by treating Mother's move as a "relocation." Contrary to the trial court's findings, Father testified that Mother's move to Smicksburg did **not** significantly impair his exercise of custodial rights. *See* N.T., 4/2/2025, at 90 (testifying that Mother's move had "not really" affected his custodial period with B.C. and C.C.). Father further acknowledged that Grandmother's address in Punxsutawney is an eighteen-minute drive from his house, and the Smicksburg address is a twenty-minute drive from his house. *See id.* at 92-93. Thus, Mother's move to Smicksburg resulted in a difference of a mere two minutes in driving time from Father's house. *See id.* at 93. Father also testified that aside from his slight increase in geographic distance, Mother's move had not impacted his custody rights. *See id.* at 92.

Based upon Father's testimony, this case did not involve a relocation as defined by the Act. *Cf. C.M.K. v. K.E.M.*, 45 A.3d 417, 422 (Pa. Super. 2012) (holding that the mother's proposed move constituted relocation under section 5322 because the proposed relocation "threatened significant impairment" of the father's ability to exercise his custodial rights). Thus, section 5337 of the Act was not triggered in this case. Consequently, Mother was not required to file a notice of relocation with an affidavit and counter-affidavit pursuant to section 5337(c) and (d). It follows that the trial court was not required to consider the relocation factors pursuant to section 5337(h).

We disagree, however, with Mother's bald assertion that the trial court's determination on relocation "incorrectly informed its decision" to modify custody. Mother's Brief at 28. Although not properly treated as a "relocation," the trial court correctly assessed whether the move to a new house negatively impacted the children when considering their best interests pursuant to the custody factors under section 5328. When determining custody, section 5328 requires the trial court to consider, inter alia, which household provides the children with more stability and continuity in their education, family, and community life, as well as "[a]ny other relevant factor" impacting their best interests. 23 Pa.C.S. § 5328(a)(4), (16). Thus, while improperly labeled under section 5337(h), the trial court did not err by considering how Mother's move impacted the children when considering their best interests. As such, this aspect of Mother's first issue on appeal also fails.

Weighing of Custody Factors

In her second issue, Mother argues that the trial court abused its discretion by analyzing section 5328(a)(8) and (16) "through the lens that [she] was not in compliance" with the existing custody order. Mother's Brief at 38. In addition, Mother argues that the trial court abused its discretion in weighing subsections (4), (9), and (10) in Father's favor because the trial court previously found these factors were evenly weighted between the parties when it issued the existing custody order on February 8, 2024. *Id.* at 31. Mother supports her argument by disputing the trial court's credibility

determinations, which she argues inappropriately favored Father and disfavored her. *Id.* at 32. Finally, Mother argues that the trial court abused its discretion in weighing section 5328(a)(13) neutrally in this case. *Id.* at 35.

Section 5328(a) of the Act requires that when issuing "any form of custody," the trial court must separately analyze each factor in effect at the time of the custody decision, "giving substantial weighted consideration to the factors … which affect the safety of the child." 23 Pa.C.S. § 5328(a).[8] The factors at issue in this case included:

> **(a) Factors.** In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving substantial weighted consideration to the factors specified under paragraphs (1), (2), (2.1) and (2.2) which affect the safety of the child, including the following:
>
> (1) Which party is more likely to ensure the safety of the child.
>
> (2) The present and past abuse committed by a party or member of the party's household, which may include past or current protection from abuse or sexual violence protection orders where there has been a finding of abuse.
>
> (2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).
>
> (2.2) Violent or assaultive behavior committed by a party.

---

[8] The General Assembly has since amended the section 5328(a) custody factors. *See* 23 Pa.C.S. § 5328 (Act of June 30, 2025, P.L. 18, No. 11, § 1, effective Aug. 29, 2025).

(2.3) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party if contact is consistent with the safety needs of the child.

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life, except if changes are necessary to protect the safety of the child or a party.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's developmental stage, maturity and judgment.

(8) The attempts of a party to turn the child against the other party, except in cases of abuse where reasonable safety measures are necessary to protect the safety of the child.  A party's reasonable concerns for the safety of the child and the party's reasonable efforts to protect the child shall not be considered attempts to turn the child against the other party.  A child's deficient or negative relationship with a party shall not be presumed to be caused by the other party.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another.  A party's effort to protect a child or self from abuse

by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S. § 5328(a) (effective Aug. 13, 2024, to Aug. 28, 2025). While a court's consideration of these factors is mandatory, "it is within the trial court's purview as the finder of fact to determine which factors are most salient and critical in each particular case." *E.B. v. D.B.*, 209 A.3d 451, 460 (Pa. Super. 2019) (citation omitted).

The record reflects that the trial court did not weigh any of the custody factors in Mother's favor. *See* Findings of Fact and Conclusions of Law, 7/18/2025, at 21-24 (unpaginated). The court weighed the subsection (1), (4), (8)-(10), and (16) factors in Father's favor; found those in subsections (2.3), (3), (5), (7), (11), (12), (13) to be neutral; and that the remaining factors were inapplicable. The trial court found the factors discussing B.C.'s and C.C.'s need for stability and continuity to be particularly significant:

Father's house is currently the more stable house among the parents and has the continuity in [B.C.'s and C.C.'s] education, family life and community life. A year ago, this [c]ourt found that Mother's house did not fit "the traditional" stable household. At that time, this court complimented the relationship with [G]randmother … for helping [B.C. and C.C.]. Custody cases being decided by a preponderance of the evidence, this was an ever so slight tip of the even balance. This [c]ourt finds Mother's testimony not credible in regard to [B.C. and C.C.] doing

homework at her house and finds Father and [Stepmother]'s testimony to be credible that they "work their ass off" to catch [B.C. and C.C.] up on their homework during their week of custody. Taking the testimony as a whole, [B.C.'s and C.C.'s] homework and school activities are not done with the same stability and continuity at Mother's house, as Father's. Although this [c]ourt is very thankful (as Mother and Father should be) for [Grandmother] doing her best to keep the children on task[,] she is not a parent, although for educational purposes, she has been for several years. [Grandmother] is simply not available with Mother's current move and the additional children to keep up her past level of care [of B.C. and C.C.] … As [B.C. and C.C.] enter high school, Father's house provides a more stable location for the children to succeed in their studies and their community life in general.

Findings of Fact and Conclusions of Law, 7/18/2025, at 21-22 (unpaginated). The court similarly found section 5328(a)(9) and (10) favored Father because he has a "consistent lifestyle," and B.C. and C.C. "know their schedule at Father's [house] and succeed at that schedule. At Mother's house, they are unsure where they will be in [twenty-four] hours and what they will be doing." *Id.* at 22-23 (unpaginated).

Beginning with Mother's claims as to subsection (a)(8), she asserts that the trial court abused its discretion in weighing this factor in Father's favor based upon facts it concluded constituted contempt, i.e., that Mother allowed B.C. not to attend two Girl Scout events because B.C. "did not want to go." *Id.* at 33-34; Findings of Fact and Conclusions of Law, 7/18/2025, at 22 (unpaginated). Specifically, the court found under section 5328(a)(8) that Mother demonstrated a "laissez-faire attitude" toward B.C.'s participation in the Girl Scout events that Father wanted her to attend, and that this

constituted an attempt to turn her daughters against Father. Findings of Fact and Conclusions of Law, 7/18/2025, at 22 (unpaginated).

This finding is supported by the record—in particular, Father's testimony. *See* N.T., 4/2/2025, at 9-11; 118-20 (Father testifying that Mother agreed that B.C. would attend Girl Scout events occurring during Mother's custodial time; Father paid for these events; but B.C. did not go because, per Mother, she "didn't want to"). As such, Mother's argument necessarily fails, as the trial court's findings under subsection (a)(8) were based upon its credibility findings in favor of Father and against Mother, which we may not disturb. *See White*, 296 A.3d at 1213.

Turning to her argument concerning subsection (a)(16), she asserts that the trial court likewise abused its discretion in that factor by considering the facts underlying Father's April 29, 2024 contempt petition, as follows:

> Mother showed her lack of education concern [regarding B.C. and C.C.], which has been a constant in this case. Her totally deceptive testimony taking [B.C. and C.C.] to Splash Lagoon instead of letting them attend school that Friday was inappropriate. Both girls should have been in school that day but Mother let them miss for the convenience of her and her family's trip to Splash Lagoon, then comes to court and testifies, brazenly, that it was only because [B.C. and C.C.] were sick that she took them on vacation[] early.

Findings of Fact and Conclusions of Law, 7/18/2025, at 23 (unpaginated). Again, we discern no abuse of discretion by the trial court as its findings were based upon the court's credibility determinations concerning Mother's testimony.

- 21 -

Finally, with respect to the trial court's findings regarding the factors addressing stability at section 5328(a)(4), (9), and (10), the record supports the trial court's conclusion that circumstances had changed following the issuance of the existing custody order such that they were no longer weighed equally between Mother and Father. To begin, Grandmother's testimony confirmed that her physical time with B.C. and C.C. is significantly reduced from the time of the existing custody order when they lived with her in the weeks that they were not with Father, and she assisted with their homework. She explained that since Mother moved to the new house, B.C. and C.C. stay overnight with her approximately one weekend per month. *See* N.T., 4/7/2025, at 27, 42. In addition, Grandmother testified that C.C. "probably stays one or two nights the weeks that [Mother] has her[,]" but B.C. is "mostly with [Mother]. She will stay with me once in a while." *Id.* at 42-43. As stated above, when issuing the existing custody order, the trial court had found Grandmother to be a stabilizing force for the children while they were living with Mother. In her absence, the trial court concluded that as the children "get older and face more challenges, Mother is unable to meet their needs." Finding of Fact and Conclusion of Law, 7/18/2025, at 24 (unpaginated).

The trial court found credible Father's testimony that he and Stepmother "bust[] [B.C.'s and C.C.'s] asses to get good grades, [or] they wouldn't" be receiving those grades. N.T., 4/2/2025, at 47. Specifically, he testified that C.C. started maintaining grades over eighty percent after he oversaw her

completion of "weeks and weeks and weeks and weeks of makeup work[.]"

*Id.* at 106. When he attempted to confront Mother about C.C.'s school issues

via messages through OFW, he testified that Mother was not invested in

helping C.C. overcome these hurdles:

Q. Did you express [to Mother] your concerns regarding homework and [C.C.]'s grades and what's going on?

A. I did.

Q. And that [C.C. is] not getting things done?

A. Correct.

\* \* \*

Q. And did [Mother] indicate that she spoke with [C.C.] about this?

A. Yes.

Q. What was [Mother's] response[?]

A. [Mother replied,] "I told [C.C.] repeatedly to make sure her work was done and backpack was cleaned out because it was a mess of papers. **I think if she doesn't want to do her work then we just let her be held back — or let her do that and be held back.** I've told [C.C.] the consequences and tried to help her."

Q. So, [Mother] spoke with [C.C.] and said let her fail?

A. Yes.

Q. Was that your … plan?

A. Absolutely not.

Q. Do you … talk to [C.C.] once and let it go[?]

A. No, we got to keep on her because if not she's not going to do it.

*Id.* at 53-54 (emphasis added); *see also* Exhibit 15.

Further, Father testified that B.C. and C.C. have "flex days" when school is closed because of bad weather, and the students are expected to do schoolwork at home. *Id.* at 66. Father testified that B.C., but not C.C., accomplished schoolwork on the flex days this past winter when in Mother's custody. *Id.* at 67. For instance, Father testified that the school marked C.C. absent for "a day and a half" for flex days on February 21 and 22, 2025, which occurred during Mother's custodial week, because she did not do her schoolwork. *Id.* at 67. Father testified that he confronted Mother about this in OFW messages, but Mother showed no concern. *Id.* at 67-68; *see also* Exhibit 21.

Based upon the foregoing, we discern no abuse of discretion in the trial court's conclusion that "Father's house provides a more stable location for the children to succeed in their studies and their community life in general." Findings of Fact and Conclusions of Law, 7/18/2025, at 22 (unpaginated); *see also id.* at 22-23; *Holler v. Smith*, 928 A.2d 330, 331-32 (Pa. Super. 2007) ("[C]hild custody orders are temporary in nature and always subject to change if new circumstances affect the welfare of a child.") (unnecessary capitalization omitted). Therefore, Mother's second issue also fails.

### The Children's Preference

In her third issue, Mother argues that the trial court abused its discretion by failing to address B.C.'s and C.C.'s preference that the custody schedule

remain the same as set forth in the existing custody order. *See* Mother's Brief at 43. We disagree with Mother's characterization of the trial court's findings insofar as it clearly explained that it **had** considered the children's testimony "in light of the law," which requires trial courts to consider the "well-reasoned preference of the child, based on the child's developmental stage, maturity and judgment." Findings of Fact and Conclusions of Law, 7/18/2025, at 22 (unpaginated); *see also* 23 Pa.C.S. § 5328(a)(7). This Court has long held that no particular amount of detail is necessary when a trial court discusses the section 5328(a) factors. *See A.V. v. S.T.*, 87 A.3d 818, 823 (Pa. Super. 2014) (citation omitted) ("[T]here is no required amount of detail for the trial court's explanation; all that is required is that the enumerated factors are considered and that the custody decision is based on those considerations."). Indeed, the Act does not require that a trial court place substantial weight upon a child's preference in fashioning a custody award. *See* 23 Pa.C.S. § 5238(a) ("In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving substantial weighted consideration to the factors specified under paragraphs (1), (2), (2.1) and (2.2) which affect the safety of the child.").

The record reflects that B.C. and C.C. testified in general about their home life with Mother and Father. They both indicated that there is nothing that they would want to change about the current custody schedule. *See* N.T., 4/2/2025, at 270, 283. Neither the trial court nor counsel for the parties

inquired further about the children's preferences. The trial court weighed their testimony neutrally under section 5328(a)(7), and we discern no abuse of discretion. The trial court considered B.C.'s and C.C.'s preferences in fashioning its custody order. Therefore, Mother's claim fails.

### Verification

In her fourth issue, Mother argues that the trial court erred by failing to find Father's failure to verify his custody modification petition and his contempt petitions "worthy of consideration." Mother's Brief at 46. Specifically, Mother asserts that "numerous issues included in his various [contempt] petitions were not consistent with" Father's testimony.[9] *See id.* at 47. She baldly asserts that "these inconsistencies in Father's testimony and the lack of a verification page executed by Father were a fatal error to the trial court's review of the modification." *Id.* at 48. Mother is not entitled to relief.

Rule 1024 of our Rules of Civil Procedure provides, in relevant part:

(a) Every pleading containing an averment of fact not appearing of record in the action or containing a denial of fact shall state that the averment or denial is true upon the signer's personal knowledge or information and belief and shall be verified.

\* \* \*

---

[9] Mother provided an example regarding Father's allegation in his October 11, 2024 contempt petition that Mother failed to notify him that she changed the children's dental provider, which was untrue because Father testified that the new provider was used for B.C.'s and C.C.'s braces, and that the children continue to use their general dentist provider. *See* Mother's Brief at 47; *see also* N.T., 4/2/2025, at 49, 126-28.

> (c) The verification shall be made by one or more of the parties filing the pleading unless all the parties (1) lack sufficient knowledge or information, or (2) are outside the jurisdiction of the court and the verification of none of them can be obtained within the time allowed for filing the pleading. In such cases, the verification may be made by any person having sufficient knowledge or information and belief and shall set forth the source of the person's information as to matters not stated upon his or her own knowledge and the reason why the verification is not made by a party.

Pa.R.Civ.P. 1024(a), (c); *see also Alatrista v. Diamond Club*, 267 A.3d 1257, 1260 (Pa. Super. 2021) ("[V]erified 'means supported by oath or affirmation or made subject to the penalties of 18 Pa.C.S.[] § 4904 relating to unsworn falsification to authorities.'") (quoting Pa.R.Civ.P. 76).

Our Rules are to be liberally construed "to affect a just result." *Alatrista*, 267 A.3d at 1260. Rule 126 expressly allows "The court at every stage of any such action or proceeding may disregard any error or defect of procedure which does not affect the substantial rights of the parties." Pa.R.Civ.P. 126. Our review of the record confirms Mother's claim that Father failed to verify his petition for modification in all but his first contempt petition filed in April 2024. Instead, Father's counsel verified the pleadings. Prior to Mother presenting her evidence on the second and final day of the proceedings, her counsel argued on the record and in open court that it was improper for Father's counsel to verify the custody modification petition. *See* N.T., 4/7/2025, at 3-4. Mother's counsel made the following request:

> It's our position that because of the fact that modification was not done in a proper manner that the [c]ourt should consider whether

- 27 -

or not the actual petition itself should move forward. And so that is something that we would be asking the [c]ourt to consider whether it is now or[,] given that we have testimony that's to be presented[,] at the conclusion of the hearing before reaching a decision.

*Id.* at 4. The trial court denied the request and reasoned:

Well, I normally see that objection mostly as a preliminary objection…. And I usually grant it as a preliminary objection[;] however[,] we're at the end of [Father]'s case. He has testified and we're supposed to be here ultimately for the best interest of the child[ren], so … at this stage of the case I'm going to deny your motion.

*Id.* at 5. We discern no abuse of discretion.

Initially, to the extent Mother argues that the court erred in allowing Father's contempt petitions to move forward for lack of verification, we conclude that she has waived the claim because her objection related only to Father's petition to modify custody. *See* N.T., 4/7/2025, at 3-4; *see also* Pa.R.A.P. 302(a) ("Issues not raised in the trial court are waived and cannot be raised for the first time on appeal."); *MacNutt v. Temple Univ. Hosp.*, 932 A.2d 980, 992 (Pa. Super. 2007) (holding that in order to preserve an issue for appellate review, litigants must make timely and specific objections during trial).

We further discern no abuse of discretion by the trial court in denying Mother's request to dismiss Father's modification petition for lack of verification on timeliness grounds, as it was presented "at the end of [Father]'s case." N.T., 4/7/2025, at 5. The trial court was undoubtedly correct that granting Mother's request would not serve the best interest of the children "at

this stage of the case," and Mother has failed to make any showing of prejudice resulting from Father's procedural misstep. ***Id.***; ***see also*** Pa.R.Civ.P. 126. Accordingly, Mother's fourth claim for relief fails.

### Contempt

In her fifth and final issue, Mother argues that the trial court erred in finding her in contempt of the existing custody order. Specifically, Mother asserts that the trial court based its contempt order, in part, upon two of Father's contempt petitions that involved "her move to the Smicksburg address." Mother's Brief at 50. Thus, we discern that the contempt petitions Mother intends to address are those filed by Father on May 28 and November 20, 2024. Mother contends that the trial court abused its discretion in granting these petitions. ***Id.*** at 50-51.

Our standard of review in this context is well-established:

> This Court's review of a civil contempt order is limited to a determination of whether the trial court abused its discretion. If a trial court, in reaching its conclusion, overrides or misapplies the law or exercises judgment which is manifestly unreasonable, or reaches a conclusion that is the result of partiality, prejudice, bias or ill will as shown by the evidence of record, then discretion is abused.

> ***Gross v. Mintz***, 284 A.3d 479, 489 (Pa. Super. 2022) (citation omitted). To sustain a finding of civil contempt, the complainant must prove certain distinct elements by a preponderance of the evidence: (1) that the contemnor had notice of the specific order or decree which he is alleged to have disobeyed; (2) that the act constituting the contemnor's violation was volitional; and (3) that the contemnor acted with wrongful intent. Moreover, [a] court may exercise its civil contempt power to enforce compliance with its orders for the benefit of the party in whose favor the order runs

but not to inflict punishment. A party must have violated a court order to be found in civil contempt.

*Id.* (citations and quotation marks omitted).

In his May 28 and November 20, 2024 contempt petitions, Father alleged that Mother violated the following provisions of the existing custody order:

14. Information [("the 24-hour notice provision")]. Both parties shall notify the other as to any change in their address, telephone number, cell phone number, email, etc. within twenty-four (24) hours of any changes.

* * *

16. Relocation [("the relocation provision")]. No party may relocate the children by a change of address, which significantly impairs the ability of the non-relocating parent to exercise custodial rights. No relocation shall occur unless every other person with custody rights consents to the relocation or the [c]ourt approves the proposed relocation. The party proposing relocation must notify every other person who has custody rights to the children as required by [23] Pa.C.S.A. § 5337(c), including notice to all parties of the obligation to file a counter-affidavit within thirty (30) days of service of the notice in order to preserve the right to have objected to the relocation.

Trial Court Order, 2/8/2024, ¶¶ 14, 16.

In the May 28, 2024 contempt petition, Father alleged that Mother violated the relocation provision of the existing custody order. *See* Petition for Contempt, 5/28/2024. Father contended that the first time he heard about Mother's move to Smicksburg was after it had already occurred. *See id.* Therefore, Father asserted that Mother was in contempt of the relocation

- 30 -

provision because she failed to file the proper notice of her proposed move pursuant to section 5337 of the Act. *See id.*

The trial court granted the May 28, 2024 contempt petition and found as follows.

1. The allegations in this [p]etition for [c]ontempt surround the relocation from Mother's residence with Paula Quick … to the May 9th purchase and May 27th relocation to the house she purchased [in] … Smicksburg with Dustin Fetterman.

2. Mother did not file a Notice of Relocation with the [c]ourt, [nor did she] serve[] Father with a Counter-Affidavit.

3. Mother's only notice was posting on My Family Wizard, a message to Father on May 27th, … to indicate she was moving to Smicksburg.

4. As Mother, through counsel, pointed out, she did not violate [the 24-hour notice provision] or the first sentence of [the relocation provision].

5. However, Mother did willfully avoid the remainder of [the relocation provision] of this [c]ourt's [o]rder of February 8, 2024, by not having Father's consent nor filing [a] Notice and a Counter[-]Affidavit subject, as the law requires, under 23 Pa.C.S.A. [§] 5337.

6. Her conduct in not filing the Notice, Affidavit and Counter-Affidavit was intentional, willful and contemptuous.

Finding of Fact for Petition for Contempt and Sanctions Filed May 28, 2024.

As discussed in our resolution of Mother's first issue on appeal, we have already concluded that Mother's move to Smicksburg did not constitute a relocation within the meaning of sections 5332 and 5337 of the Act. For the same reasons, Mother's move to Smicksburg also did not constitute a relocation within the meaning of the relocation provision of the existing

custody order, as that provision parrots, in pertinent part, the language of the Act. Therefore, the trial court abused its discretion in granting Father's May 28, 2024 contempt petition.

Mother also contends that the trial court abused its discretion in granting Father's November 20, 2024 contempt petition, which related to both the 24-hour notice and the relocation provisions. Father alleged, in pertinent part:

> 7. [On] November 20, 2024[,] Father discovered from the Punxsutawney School District Office that Mother had been in the School District Office last week and changed the children's address to somewhere in Punxsutawney.
>
> 8. Father was never given any notice of intention to move, and Mother has failed to disclose where she moved the minor children to.
>
> 9. All of Mother's actions are in violation of [the relocation provision] and [the 24-hour notice provision] of this [c]ourt's February 8, 2024 [c]ustody [o]rder.
>
> 10. Mother has willfully and voluntarily violated the terms of this court's [o]rder of February 8, 2024.
>
>            *     *     *
>
> 13. [On] November 20, 2024, Father discovered during a call with Punxsutawney School District that Mother had changed the minor children's address the week before and had not informed Father.
>
> 14. The school could not release the children's new address to Father and Mother has not responded to Father's inquiries.
>
> 15. Father does not know where the minor children are living at this time and Mother has long exceeded the twenty-four-hour notification required under the February 8, 2024 order.

Petition for Contempt, 11/20/2024, ¶¶ 7-10, 13-15. Simply put, Father alleged that Mother returning B.C.'s and C.C.'s address to an address within

- 32 -

the Punxsutawney School District (i.e., Grandmother's home) constituted another relocation to which he did not receive the required notice before or after it occurred. *See id.* In this petition, Father requested that Mother pay $2,500 for attorney's fees, $10,000 in sanctions, and spend 30 days in county jail. *See id.* at 5 (unpaginated).

The trial court found that Father's allegations relating to Mother's purported relocation under the relocation provision "has already been addressed in a prior section." Finding of Fact for Petition for Contempt and Sanctions, ¶ 1. Thus, the trial court did not find Mother in contempt of the relocation provision a second time.

The trial court did, however, find Mother in contempt of the 24-hour notice provision. *Id.* We discern no abuse of discretion.

As set forth above, the 24-hour notice provision required the parties to "notify the other as to any change in their address[.]" Trial Court Order, 2/8/2024, ¶ 14. The record reflects that Mother changed the children's address at the start of the school year to Grandmother's address to allow the school bus to pick them up and drop them off at Grandmother's house. N.T. 4/2/2025, 184-85 (Ms. Evans' testimony that the Punxsutawney School District permitted the bus stop to be at Grandmother's house upon Mother providing her rental agreement with Grandmother). Father testified that he sent Mother a message on OFW on November 20, 2024, stating that the school district informed him on that day "that you moved once again and now live

back in the Punxsutawney School District. Can I please ask what's going on?" N.T., 4/2/2025, at 57. Father testified that Mother did not respond until November 25, 2024, which was in violation of the 24-hour notice provision. *Id.*

Thus, the record supports the trial court's determination that Mother failed to notify Father within twenty-four hours of a change in address. This violated the 24-hour notice provision of the existing custody order. As such, the trial court properly found Mother in contempt of this provision as alleged in Father's November 20, 2024 petition.

**Conclusion**

Accordingly, we affirm the trial court's order modifying the custody awards. We vacate the order of court holding Mother in contempt for failing to comply with the notice provisions of section 5337 of the Act and remand for proceedings consistent with this memorandum.

Child custody order affirmed. Order of contempt reversed in part. Case remanded. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 5/1/2026